### Joe Durfee v. The State.

No. 2968.   Decided March 4, 1914.

Rehearing denied April 1, 1914.

1.—Murder—Circumstantial Evidence—Sufficiency of the Evidence—Death Penalty.

Where, upon trial of murder, the evidence was wholly circumstantial, but pointed to the defendant as the person who committed it and no other, the conviction assessing the death penalty must be affirmed.

2.—Same—Evidence—Prejudice of Witnesses—Harmless Error.

Where, upon trial of murder, some of the State's witnesses who testified to material facts for the State were biased, the court should have permitted the defendant to show that these witnesses tried to coerce the defendant into a confession in order to show their interest, bias and prejudice; however, as this was admitted, as also the facts to which they testified, with the exception of possibly one which was proven by other testimony, the error if any, was harmless, and there was no reversible error.

3.—Same—Clothing of Deceased—Evidence.

Where, upon trial of murder, the evidence was entirely circumstantial, and the clothing of deceased showed that the cuts and rents made therein were made with an instrument such as the knife which was found in defendant's possession and also indicated the location of the wounds, there was no error in admitting in evidence the clothing of deceased. Following Noftsinger v. State, 7 Texas Crim. App., 301.

4.—Same—Evidence—Immaterial Testimony—Practice.

Where, upon trial of murder, testimony was admitted which was immaterial without objection on the part of defendant or his counsel, but the court voluntarily, on his own motion, excluded the same, there was no error.

5.—Same—Impartial Jury—Impartial Trial.

Where counsel on motion for rehearing contended that the public mind was inflamed at the time of the trial, and defendant could not have received a fair trial, but there was nothing in the record to show that such criticism was well founded, but that defendant was tried by an impartial jury, there was no reversible error.

6.—Same—Sufficiency of the Evidence—Circumstantial Evidence.

Where, upon trial of murder assessing the death penalty, there was no evidence pointing to any other person who may have committed the crime, but

all the facts and circumstances pointed with specific clearness to the defendant as the guilty agent, a conviction assessing the death penalty will not be disturbed.

Appeal from the District Court of Brazoria. Tried below before the Hon. Samuel J. Styles.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*Burns & Williamson,* for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was prosecuted and convicted of murder, and his punishment assessed at death.

The testimony upon which this conviction was had is wholly circumstantial, and appellant's able counsel earnestly insist that it is not of that cogency and force to exclude to a moral certainty every other reasonable hypothesis than the guilt of the defendant. We have read and re-read the record, and there is no circumstance pointing to another, but innumerable circumstances pointing to appellant as the person who killed and outraged Mrs. Seitz, and we would not feel authorized to disturb the verdict on this account.

When N. M. Gibson, a witness for the State, was testifying, appellant desired to elicit from him the fact that he and others had taken appellant from jail and carried him out on the road some distance from town, and sought to extort a confession from him as tending to show the animus of the witness toward appellant, and the interest he was taking in the case. And in another bill it is shown that while appellant was on the witness stand he desired to testify that Mr. Gibson, Mr. Nevill and others took him out of jail, put a rope around his neck, threatening to hang him, and otherwise maltreated him in an effort to extort a confession from him to show the interest, bias and prejudice of Gibson, Nevill and the others named. The court erred in not permitting appellant to testify to the facts tending to show interest, bias and prejudice of the witnesses. Mr. Nevill especially had testified to very material facts for the State. But should the refusal to admit this testimony work a reversal of the case? Mr. Nevill frankly admitted that he was assisting the sheriff in hunting up evidence in the case, thus admitting the interest he had taken and was taking in the case. He testified to finding a knife at appellant's house that was proven to be appellant's knife; he testified to finding an undershirt with blood on it; that he also found blood on the drawers. Octavia Brown, who lived with appellant, testified that the knife belonged to appellant, and the undershirt and drawers belonged to him also. That he had bathed the night of the homicide, and changed underclothing, leaving these clothes there in the house.

Appellant himself testified and admitted that the clothing found and

the knife were his property. He said he had made the knife from an old case-knife, it having been sharpened on both sides, and filed down to a point at the end. He admitted that his undershirt had blood on it, but said in shaving he cut himself, and in wiping the blood off his face he had gotten it on his undershirt. But appellant denied that there was blood on the drawers, claiming it was rust stain. Thus, as to the material points testified to by Mr. Nevill and others, whose interest and bias appellant desire to introduce testimony to prove, appellant himself testified to the same facts, except in the instance of whether it was blood on the drawers or simply rust stain, he contending that it was rust stain. Were these witnesses whom he desired to show were taking an active interest in the prosecution, and were biased in their opinions, the only witnesses who testified to blood being upon the drawers we would hesitate long before holding that the error in excluding this testimony was immaterial. But in addition to Nevill testifying that there was blood on the drawers, Mr. Malcolm Masterson testified that he was one of the men who secured the drawers, and he testified that "he found blood stains on them,—at least two spots of blood." It is not claimed in either of the bills that Mr. Masterson was one of the men who carried appellant away from the jail or that he had any interest in the prosecution, or was in any way prejudiced against appellant. In addition to this the record discloses that these drawers, with the stain on them, were introduced in evidence, and the jury thus given an opportunity to pass on whether it was blood on the drawers or merely rust stain, as contended by appellant. Under such circumstances we do not think the ruling of the court, while erroneous, presents reversible error.

Again it is contended that the court erred in admitting the clothing in evidence. It is seen that it was material to admit the undershirt and drawers of appellant as to whether or not there was blood on them, they being shown to be appellant's beyond all doubt, and found in his house the day after the homicide, and we do not understand appellant's objection goes to the introduction of these clothes, but to the introduction of the clothing worn by deceased on the occasion when she was killed. It has always been held that it is permissible only to introduce bloody clothing when their introduction serves to illustrate some point, or solve some question, or throw light upon the matter connected with the proper solution of the case, but whenever the clothing would, in the light of the whole case, aid the jury in properly solving the issues in the case, the court should not hesitate to admit it in evidence. The knife found at appellant's house, and admitted by him to be his knife, and one he had made from a case knife, and is thus described in the record: "Blade about five inches long, about one-half or three-fourths of an inch wide at the hilt, tapering on each edge to a fine point, sharp on both sides, and having a white bone handle about four inches long."

Dr. Motherall testified: "I am a physician, and have been practicing for about ten years. I have been in Angleton since June 17th this year. I was there at the time Mrs. Seitz's body was found. I saw the body

about sun up on the morning it was found. I saw her in the alley—she had not been moved when I got there. She was lying in the alley on the side next to the Stockwell place, near the hedge, about two feet from the hedge, her head was south and her feet north, and her clothing was all up around her knees on one side, and the right knee was drawn up, and the left was straight out, and her left arm was lying across her breast hiding the gashes, and her right hand was around by her side; and the clothing was wet from the dew, and her hair was wet from the dew or fog that formed that night, and her black skirt was white and her stockings were white, and wet; and the mucous membrane was eaten out from between her lips by the ants. I cut her clothing away under the direction of the justice of the peace; and the first I found a contusion of the forehead there, from some heavy instrument or blow; and another one over the left ear, cutting the ear, and bruising the side of the head; and the wounds from her ear down to her neck all the way down her throat indicating that she had been choked and bruised and there was a discoloration; and I found a place at the juncture of the neck and chest where she had been stamped, showing the prints of the tacks in the heel, and I found a place on her left muscle of her right arm where she had been bitten, and I found four stab wounds about the heart, in the region of the heart; on the left side; I probed those wounds —one of them went almost through the body—probably six inches or more, and the others varied in depth say up to about two and one-half inches; I found the left breast caved in by some blunt heavy instrument —a rock or something of that nature—heavy enough to break the bones. We found every sign that she had been raped; we found bruises about the genital organs, and blood in the vagina and this woman had not menstruated for about five years, because she could not, as her womb and ovaries had been removed; and that was the only way for the blood to get back up there. We found discharge there—semen—that looked like discharge from the male organs. This was a microscopic examination. We found no spermatozoa germs of the male organs, but were not experienced with the microscope and of course could be mistaken. The stab wounds in the breast indicated to have been inflicted after death on account of the absence of blood; when we turned the body over the blood ran freely and the undertaker's shoes were almost filled with blood; and before we turned her over there was very little blood on the ground. The chest wounds and the wounds on the neck each would have been sufficient to cause death. Those stab wounds appeared to have been made by a long knife with two edges. (Here witness is shown the knife in evidence.) This knife could have made these wounds. According to the depth of the wounds they were smaller at the mouth of each of them. I did not see a rock at that time, but saw one later and made an examination of it, and an instrument of that character and weight could have very easily have mashed in the breast, and the mashing would have caused death." The doctor further testified that he was positive that the lady had been raped as well as murdered.

It is seen by this testimony that the wounds inflicted with a knife were of varying depth, one only going real deep. It was in evidence that the knife shown to be appellant's, and introduced in evidence, was fitted to the holes in the clothing of Mrs. Seitz; and the record discloses the following facts: That by inserting the knife in the rents in the clothing, it went to the hilt in the clothing where the deepest cut was in Mrs. Seitz's body, where the wounds in the body were shallow the knife would touch each side of the cut in the clothing before going to the hilt. The clothing further disclosed that the cuts had been made with a knife sharp on both sides. We think this demonstration would aid the jury materially in passing on whether or not the wounds were made in the body with this knife, and there was no error in admitting the clothing in evidence, this being a case depending wholly on circumstantial evidence. As said by this court in the Noftsinger case (7 Texas Crim. App., 301) in a case depending wholly upon circumstantial evidence the mind seeks to explore every possible source from which any light, however feeble, may be derived.

The only other bill in the record discloses that while Miss Lena Burridge was testifying, after she had stated she saw appellant the day of the homicide at Judge A. E. Masterson's home in answer to the question: "Did he do anything that attracted your attention particularly? A. I did not notice him much that day, but he always generally looked at me real hard; he watched me once until I got clean to the corner." In approving the bill the court states: "All the testimony was introduced absolutely without any objection on the part of defendant or his counsel, and as soon as the objectionable part of the evidence quoted was introduced I at once excluded it from the jury and positively instructed them not to consider it and no further instructions were asked by defendant's counsel." As thus qualified this bill presents no error. When the court voluntarily on his own motion excluded the testimony, appellant making no objection to it, the action of the court is to be commended, not criticised.

There was no objection made to the charge of the court either at the time it was given, nor in the motion for a new trial, and no special charges were requested. The above discussed bills are all the bills that appear in the record, and in our opinion neither of them present reversible error, and the judgment is therefore affirmed.

*Affirmed.*

ON REHEARING.

April 1, 1914.

HARPER, JUDGE.—Appellant's able attorneys make an impassioned appeal for a rehearing in this cause, among other things, saying:

"Appellant comes before this court realizing he is but a poor downtrodden, helpless creature, surrounded by a state of facts in all human probabilities not of his own making, and humbly prays the court to give his cause a careful and considerate hearing, to the end that he may

have a fair and impartial trial; and that he be not forced to suffer the penalty of death for a crime he did not in all human probability commit.

"The conclusion is irresistible that the popular mind, by virtue of the character and race of the assaultant and assaultee and the atrociousness of the alleged crime, was inflamed to such an extent as to preclude that fair and impartial trial contemplated and guaranteed by the organic law. The court will recognize from the evidence that the locality of the commission of the crime was in a small town and likely the major portion of the citizenship thereof actually looked upon the mutilated body of the dead woman, and that perhaps each person so inspecting the body graphically and vividly described its horrors to all with whom they came in contact; the average mind of the citizenship of that county, from whose body the trial jury was drawn, was in a high state of fevered perturbation. No reasonable man would undertake to measure the sea's depth when its waves were lashed in foam and froth by the tempest; and no human being should be put to trial where the issues were life and death, when the popular mind of the vicinage was storm-tossed by passion and prejudice and was clamorous for a victim. The conditions forbade the defendant receiving such a trial as is embraced in due process of law.

"Conceding the circumstances pointed strongly to appellant's guilt, they do not establish the same with that moral certainty which is indispensable in cases of circumstantial evidence. The court will recall the language of one of its greatest predecessors, when he substantially says, 'While the facts and circumstances pointing to defendant's guilt are cogent and render it quite probable that he participated in the murder, they do not impress us with that force and conclusiveness which should preclude every other hypothesis except defendant's guilt.'"

That portion of the paragraph relating to the inflamed condition of the public mind, so vividly portrayed in the language, would be of unusual strength and force if it had the least foundation in the record before us. If such a condition of affairs existed, it would be a most severe reflection on the lawyers who tried the case, for no application to change the venue was filed. But we do not think them entitled to such criticism, for in no line of the record is there any suggestion that the jury who tried appellant was not a fair and impartial jury. There is no suggestion in the record that anyone of the jury had ever heard of the case, much less formed an opinion, or that "their mind was in a high state of fevered perturbation." And if there was the slightest ground for such graphic language, we are satisfied the able counsel who tried this case would, at least, have had the record now before us, to some extent at least, reflect such condition of affairs. Of course, "a poor down-trodden, helpless creature" is entitled to a fair and impartial trial at the hands of the courts of this State, and we would be recreant to our duty, as would the trial court, if we did not see that he was given such a trial. As to being "surrounded by a state of facts, in all human probabilities, not of his own making," we can hardly agree with appellant under this

record now before us. Appellant is shown to have been the cook at Judge A. E. Masterson's. On the afternoon of this tragedy, it is shown that Judge Masterson and family went to an adjoining town to witness a game of baseball, leaving appellant in charge of the premises. It is in proof, and appellant admits that he prepared the supper that night and cooked the breakfast next morning—no one else is known to have made a fire in the cook stove, nor does the record suggest that anyone else probably may have done so. Mrs. L. B. Seitz was boarding at the home of Mrs. Turner; she left Mrs. Turner's to go to town, which would take her by the Masterson's home; she was last seen alive near the Masterson home, and when found dead was near the Masterson home. There is nothing to suggest that she got further or to any other or different place. Appellant is shown to have been at the Masterson home alone about the time when Mrs. Seitz was seen last alive near this place. Mrs. Seitz was wearing a pair of law-quarter shoes she had purchased from Sells Bros.; a wire gauze hat owned by Mrs. Seitz was missing from her effects at Mrs. Turner's, and the natural deduction is that she was wearing it that evening on her trip to town. In the ash-pan of the stove where appellant did the cooking was a bundle of wire of the character and kind used to make this character of hat; in the ash-pan also were found shoe nails, eye-lets, etc., of shoes. A pair of shoes of exactly the same number and kind worn by Mrs. Seitz was purchased from the firm from whom Mrs. Seitz purchased her shoes, and one of them burned. The nails, eye-lets, etc., secured from the ashes where this shoe was burned were of the same character, kind and description found in the ash-pan of the stove where appellant is shown to alone have done the cooking. It is true that appellant undertook to explain these things by saying that Mrs. Masterson had thrown away a wig and he burned it in the stove, and that he sometimes repaired shoes for the Masterson family, and those shoe nails may have gotten in the stove that way, yet while he called Judge Masterson, Mrs. Masterson and Billy Masterson on other features of the case, he offered no proof by either or any of them that he had ever repaired a shoe for any member of the family, or that Mrs. Masterson ever owned a wig or had ever thrown one away, and under such circumstances it is not unreasonable that the jury did not believe such explanation. Human blood was found on the post of one of the gates of Judge Masterson's home next morning. This was demonstrated by a chemical analysis. Appellant undertood to explain this away by showing that a little child had cut her foot while playing in the yard, but the evidence discloses that this little girl cut her foot several days after Mrs. Seitz had been killed, and after the post on which the human blood was found had been removed, and this explanation did not explain how the human blood came on the post the morning Mrs. Seitz's dead body was found. Mrs. Seitz's body was shown to have received four stab wounds made with a two-edged instrument. A two-edge knife was found at appellant's home, made from an old case-knife, which appellant admits he made. This knife fit the holes in the clothing, and

the wounds in the body, and, strange to say, the wounds being of varying depth, the knife of appellant, found at his home, would not go into the holes the full length only where the wound was the deepest. It is shown by the State's testimony that appellant took a bath at his home that night and changed his underclothes. When the underclothing was found, the undershirt was spotted with blood. Appellant admits the undershirt found was his shirt, and the only explanation he gives is that in shaving he may have cut himself and the blood dropped on the undershirt. Blood was on the shoes he was wearing, and he undertakes to explain that this was animal blood. There are many other facts and circumstances in evidence, but a recitation of the above is enough to show that the jury was authorized to find, and was sufficient to produce in their minds a reasonable and moral certainty that the accused and no other person committed the offense alleged. Of course, in no case depending on circumstantial evidence can it be shown beyond all peradventure of a doubt that any person committed a certain crime, but it can be demonstrated beyond a *reasonable doubt* that the person on trial committed the crime, and this is what the law demands, and what the evidence in this case fully measures up to. There is no evidence in this case pointing to any other person as the one who may have committed the crime. But all the facts and circumstances point with specific clearness to appellant as the person who on this case murdered Mrs. Seitz and outraged her person. Appellant's able counsel admit "the facts and circumstances pointing to defendant's guilt are cogent and render it probable that he participated in the murder," yet they say they do not impress them with that force and conclusiveness which should preclude every other hypothesis except defendant's guilt. These cogent facts and circumstances did so impress the jury who tried appellant; did so impress the trial judge, and, viewing the case from the record before us alone, we must confess that they impress us as they did the jury who tried appellant, and had we been a member of the jury that tried appellant we could have returned no other verdict than to adjudge him guilty.

The other questions raised are fully discussed in the original opinion, and we do not now deem it necessary to do so again.

The motion for rehearing is overruled.

*Overruled.*