SALLIE HAND, ALIAS SALLIE WHEELER, v. THE STATE.

No. 3744. Decided October 27, 1915.

Rehearing denied November 17, 1915.

**1.—Murder—Poisoning—Strychnine—Sufficiency of the Evidence.**

Where defendant was convicted of murder by administering strychnine poison to the deceased in sufficient quantities to cause his death, and the evidence, although entirely circumstantial, was sufficient to sustain the conviction, there was no reversible error.

**2.—Same—Evidence—Opinion—Expert Testimony.**

Where the State's witness qualified as an expert chemist, there was no error in permitting him to testify as to his opinion as to how much strychnine sulphate would produce the death of a man, he having made the analysis of the stomach of the deceased, and testified to the finding of six-tenths of a grain of strychnine sulphate in the body of the deceased.

**3.—Same—Evidence—Rebuttal—Circumstantial Evidence.**

Where defendant contended, upon trial of murder by administering strychnine poison, that deceased was a sickly man, and therefore may have committed suicide on account of despondency caused by ill health, there was no error in permitting the State to introduce testimony that the deceased had been in the employ of the State's witness for nearly a year, and up to the time when he was excused on leave of absence, and that during all these months, that deceased never lost a day on account of sickness, or any other cause.

**4.—Same—Evidence—Circumstances—Suicide—Rebuttal.**

Where, upon trial of murder, depending upon circumstantial evidence, it developed that defendant told a State's witness that deceased was a millionaire,

but after his death contended that deceased was a pauper, and would have to be buried by the city, at the same time saying she had $30,000 in the bank, there was no error in permitting the State to show that she had no such amount of money, but that she did have some $2400 of deceased's money in her possession at the time she said he was a pauper. Following Noftsinger v. State, 7 Texas Crim. App., 307.

**5.—Same—Evidence—Declarations of Defendant—Arrest.**

Where, upon trial of murder, there was nothing to show that defendant was under arrest at the time she made declarations to the officer who afterwards arrested her, as to the money of deceased in her possession and as to the whereabouts of a will of the deceased there was no error in admitting same in evidence.

**6.—Same—Requested Charge—Circumstantial Evidence.**

Upon trial of murder, where the guilt of the defendant was sustained by circumstantial evidence, there was no error in overruling a motion requesting the court to instruct the jury to return a verdict of not guilty.

Appeal from the District Court of Bexar. Tried below before the Hon. W. S. Anderson.

Appeal from a conviction of murder; penalty, ten years imprisonment in the penitentiary.

The following statement of the evidence introduced by the State is taken from the brief of State's counsel, and is substantially correct:

On August 15, 1913, Eugene Savoy (the deceased) was employed by the San Antonio Traction Company as controller and motor inspector, a position requiring physical labor, and his hours of work were from 10 o'clock p. m. to 6 o'clock a. m. Savoy remained in this employment from that time until June 26, 1914, leaving the company's employment on June 25, 1914, on a leave of absence. During all this time Savoy worked every day (or rather, every night) not missing a single day, and he worked eight hours on every day of said time, except as hereinafter stated, said eight hours, it being agreed, were a full working day. Of the days during said time upon which Savoy did not work eight hours, on two occasions he worked seven and one-half and seven hours, respectively, while on five other days during that time he worked more than eight hours, ranging from eight and one-half to nine and three-fourths hours.

The defendant, Sallie Hand, alias Sallie Wheeler, was employed by Mrs. Annie Long as a cook. Mrs. Long kept a boarding house at 414 Locust Street, in San Antonio, Texas. On or about the 5th of May, 1914, Eugene Savoy was a boarder at Mrs. Long's house, and on that date the defendant was hired by Mrs. Long. After the employment of the defendant by Mrs. Long, defendant and Eugene Savoy became acquainted and were often seen by Mrs. Long of mornings conversing together in the kitchen, after Savoy had returned from his night's work. Mrs. Long discharged defendant on or about the 5th day of June, 1914, and defendant left Mrs. Long's place about three days later, in the company of Savoy. Defendant stated to Mrs. Long as she left that she was going to buy some land, and that she had about thirty thousand

dollars ($30,000) in the Frost National Bank. After Savoy left with the defendant, he returned and continued to live at Mrs. Long's house for about a week longer, and then left.

On or about the 1st day of May, 1914, Sallie Hand, the defendant, made application in the Thirty-seventh Judicial District Court of Bexar County, Texas, for power to sell land without the joinder of her husband, J. A. Hand, with whom she alleged that she was not living, also alleging that the said J. A. Hand would not join in a sale of said land, and that the sale of same was necessary for her support, she being without money. This petition is duly sworn to before a notary public. This application was, on the 2nd of May, 1914, granted by order of the Thirty-seventh District Court, which order shows that it was granted upon testimony, that defendant appeared in person, as well as by attorney.

Some time later in the month of May the defendant, accompanied by Eugene Savoy, came to the office of R. L. Edwards, United States Commissioner for the Western District of Texas.

Prior to the time of this visit, defendant had requested Edwards to write to three certain people, Mr. McLeith among others, in reference to some land she claimed to own in Hamilton County.

On the visit above referred to, the defendant, in the presence of Eugene Savoy, had a conversation with Edwards in reference to this land, which conversation is substantially as follows:

Defendant asked Edwards if he had received a reply from McLeith, to which Edwards replied that he had not. Defendant then began to discuss the matter generally, saying that she and her brothers had acquired the land from her father, Pleasant Turner; that it was worth $200 per acre, but that she had agreed to sell it to Mr. McLeith for $95. She requested Edwards to write for a certified copy of the deed under which she claimed, and to write to the postmaster at the place where she said Mr. McLeith lived and inquire why he had not answered.

Later on, after defendant and Savoy had left, Edwards received a certified copy of what proved to be a will of one Pleasant Turner, dated 30th day of September, A. D. 1854, in which after making certain specific bequests, the testator left "my pre-emption to my present bodily Heirs."

Finally the letters written by Edwards to the several parties to whom defendant had asked Edwards to write were returned not delivered, and a letter was received by Edwards from the postmaster stating that McLeith was dead and had been dead for some time.

The result of these investigations had not been achieved at the time of defendant's visit to Edwards with Savoy but were later communicated by Edwards to defendant in Savoy's absence.

On July 3, 1914, Savoy came to the house of one Lizzie Carrington, a negro woman who lived at 315 Aransas Street, for the purpose of getting a room, and three days later the defendant came there. They (defendant and Savoy) stayed at this place about one month.

At the time Savoy came to Lizzie Carrington's house he was apparently a well man, and continued to be in good health until he had been there for some time. During this time, and whilst Savoy showed no evidences of illness, defendant and Savoy one day came to Lizzie Carrington and asked her where they could find a notary public, and she told them almost any place up town. They told Lizzie Carrington that they wanted to make a will, and then went up town and later came back, and then defendant told Lizzie Carrington that she and Savoy had made a will, that she (defendant) had made her will to Savoy and that Savoy had made his will to the defendant.

On July 7, 1914, Savoy and the defendant appeared before T. M. West, an attorney, and asked him to draw for them a joint will, which West did, making each the sole legatee and independent executor of the other, without bond.

Soon after this Savoy began to complain that he was deaf, and at other times that he was blind, and at others that his teeth were loose, and at others that his throat was sore and that he could eat nothing, and at other times he would jump up and run out doors and say he had to run out of doors to get his breath, and that he thought that he was dying. During this time defendant was continually with the deceased, Savoy, but did not explain to Lizzie Carrington what her business with him was. She discussed the condition of Savoy's health with Lizzie Carrington, and in the course of the conversation she made this statement: "If he (Savoy) was to die, what would you think,—what would people think if he was to fall dead some day?" and Lizzie Carrington replied by asking defendant why she asked this question, and defendant answered that Savoy was sick.

About the 3rd of August, 1914, Savoy left Mrs. Carrington's place, and a few days later the defendant left. On or about the 1st of August, 1914, Savoy came to 924 South Flores Street, the house of Mrs. Ida Schneider. He came one night and the defendant arrived the next day.

When Savoy came to Mrs. Schneider's place he did not seem sick, but after he came there he had two spells. The first of these spells (August 4, 1914) Savoy began screaming and hollering for a doctor, and Mrs. Schneider and her husband were awakened, and Mrs. Schneider went and got a doctor, Dr. Gray. While Savoy was screaming and hollering the defendant came out of the room, shut the door, and went down the hall, and turned out the lights, and said that Savoy did not need a doctor; and Mr. Schneider turned the lights on again and instructed the defendant to leave them on. Dr. Gray, having been called by Mr. Schneider, attended Savoy on August 4, 1914. He came to the house and found the deceased in violent convulsions and suffering from the unmistakable symptoms of strychnine poisoning. For this condition the patient could give no satisfactory reason. Dr. Gray treated him and got him relaxed and in a safe condition, and returned about midnight to find Savoy resting well.

Following this attack, Savoy kept in bed late the next morning, but finally got up and seemed to be all right. The landlady, Mrs. Schneider,

however, thought that he ought to receive some medical treatment, and she so told the defendant, but the defendant answered that he had seen every doctor in town and that none of them could do him any good. Mrs. Schneider replied by asking if he had seen Dr. Ward, and being told that he had not she went in and spoke to Savoy himself about it, and he agreed to see Dr. Ward, whereupon the defendant said that she would go, too, and Mrs. Schneider conducted both the defendant and Savoy to Dr. Ward's office.

Savoy first consulted Dr. Ward on the 10th day of August, six days after the attack from which Dr. Gray had relieved him. At the time that he came to Dr. Ward, Ward made an examination of the deceased and found him suffering from syphilis and also suffering with either strychnine or prussic acid poisoning, the symptoms of which are similar up to the final convulsions that take place in strychnine poisoning. Prussic acid poisoning is also evidenced by sore throat, and syphilis could not have produced the conditions found by Dr. Ward to exist at the time that he made the examination.

Dr. Ward prescribed for Savoy and gave him several prescriptions, none of which either contained strychnine or prussic acid or anything that would produce the symptoms similar to either of these drugs, except one prescription. This prescription was what is known as "anti-constipation tablets," which tablets as given by Dr. Ward to the deceased are composed of aloin one-fourth ($\frac{1}{4}$) grain, strychnine sulphate one-sixtieth (1-60) grain, extract of belladona leaves one-eighth ($\frac{1}{8}$) grain, and ipecac one-sixteenth (1-16) grain. Dr. Ward delivered to Savoy sixty-two of these pellets, or only one and one-thirtieth (1 1-30) grain of strychnine in conjunction with other drugs above set out.

Savoy made either four or five visits to Dr. Ward's office from the time he first went there until the 16th or 17th of August, 1914, and only on all but one of these visits the defendant accompanied the deceased. The last visit made was either the 16th or 17th of August, 1914. At this time Ward saw the bottle which he had given Savoy, containing the sixty-two pellets of "anti-constipation" remedy, and all but one-half or three-fourths of the bottle of pellets had been used, thus leaving in the possession of Savoy about three-fourths of a grain of strychnine mixed with other drugs.

In the opinion of Dr. Ward, taking into consideration the condition of Savoy as he knew it from having treated him, and the medicine that he (Ward) had given to Savoy, the latter would not have died from strychnine poisoning had he taken all the pellets in his possession at this time, because the ipecac contained in the tablets would have made him vomit and throw them up before they could have been assimilated into his system, and also, in the opinion of the doctor, because it would have taken a full grain of strychnine (which was one-fourth of a grain more than was contained in the tablets put together) to have killed Savoy in the condition in which he then was.

During the time that the defendant and Savoy stayed at Schneider's the defendant at first said that Savoy was a millionaire, and later on,

on the morning of his death, she said that he was a pauper and she guessed he would have to be buried in the city cemetery, but that she had a check for thirty thousand ($30,000) dollars in some out-of-town bank, and she showed some paper which she claimed to be such a check, to the witness Lonie Williams and another lady.

One night some time between the 4th and 20th of August, Mrs. Schneider was talking very loud to her husband, who was deaf, and the next day Mrs. Schneider asked defendant if she had heard her and her husband fussing, and defendant said, "Why don't you get a divorce from him and sue him for everything he has and take the children and come and live with me in the home I have in the country?" and Mrs. Schneider said that she could not do this because Schneider had his property so that she could not get hold of it, and the defendant answered, "Then why don't you poison him?" to which Mrs. Schneider replied, "I don't want to do that, I would be hung for doing that," and the defendant said, "They will have to prove it," and Mrs. Schneider answered that she didn't have the heart to poison her husband, and defendant said, "They will have to see you put it in his mouth before they can prove it; why don't you quit him and come and live with me?' As soon as this man (referring to Savoy) dies, I am going to my home in the country. I am going in September."

Some few days after Savoy's first attack on August 4, 1914, defendant came to Mrs. Schneider and asked Mrs. Schneider for a pencil, saying she was going to write a check and get Savoy's money. Mrs. Schneider did not see the check but she saw defendant with a book which she said resembled Savoy's bank book when the same was shown to her on the trial.

The day after Savoy's first illness on South Flores Street on about August 5, 1914, Mrs. Lonie Williams, one of the other boarders at Mrs. Schneider's house, who, with her husband, occupied a room adjoining Savoy's and heard the defendant talking to Savoy and urging him to draw his money out of the banks, saying that they were going to fail and that he would lose his money, and Mrs. Williams further heard defendant talking to Savoy about writing something, and she heard her go and borrow a pencil, and later saw her reading something, and saw her go away and later come back.

On the 5th day of August, 1914, the defendant came to the National Bank of Commerce, in which Savoy then had on deposit something over $2100, and presented an order written in Savoy's bank book to Samuel Knight, one of the clerks at said bank. This order read: "August 5th, 1914. Bank Off. Commerce. Please pay my money two Boro off this note  Eugene Savoy" Mr. Knight refused to pay her the money, and she went away, and on August 15, 1914, Savoy himself came apparently without the defendant, to the National Bank of Commerce, and Mr. Knight then paid him $2166.46 in currency, the amount of his deposit.

On the 20th of August, 1914, the defendant said to Mrs. Schneider that Savoy was going to have another one of his spells. Mrs. Schneider

replied, "How do you know?" and the defendant said, "Because his eyes are looking so funny; go in and look at him." Mrs. Schneider went in and found Savoy sitting on the bed smoking a cigar, but could see nothing unusual in his appearance.

On the same day, August 20, 1914, Savoy paid a visit to Dr. Dixon—and went there at the suggestion of Dr. Ward,—who was treating deceased for ear trouble, and Dr. Dixon found something in Savoy's ear which he (Dixon) had not prescribed and which Savoy said the defendant had put there.

On the night of August 20, 1914, nothing unusual occurred at the Schneider residence until about 10 or 11 o'clock, when Savoy began screaming and hollering again, as he had on a former occasion on August 4th, and woke the Schneiders up, and Mr. Schneider went in and asked him if he wanted a doctor, and he said, "Yes," but defendant said that Savoy did not need a doctor, that it was doctors that had gotten him the way he was, but Schneider went to the Sap depot and got Dr. Gray. Dr. Gray came and found Savoy suffering from strychnine poisoning and treated him, and spoke to him about going to the hospital the next morning, and gave deceased an antidote for strychnine, and made arrangements to have more medicine of that kind sent to him from the drug store, and left instructions for the administration of the medicine and as to how to reach him (Gray) by telephone in case Savoy should get worse, and about 11 or 12 o'clock that night Gray left; and he says that it is his opinion that if Savoy had not received more strychnine between that time and morning that he would not have died.

As Dr. Gray left he said he would have Savoy taken to the hospital the next morning, but the defendant said that she was not going to let him go to the hospital, that she could care for him herself. The next morning at 6 o'clock Mrs. Schneider heard Savoy screaming, and went into the room and found the deceased unconscious with his hands clenched on the rods of the bed and shaking and trembling and in convulsions, with the breath just leaving him, and she went up to him and started to rub his neck, and the defendant said, "Don't touch that man, keep your hands off of him."

This same morning (August 21, 1914) the defendant went into Mrs. Williams' room and said she thought that Savoy was dying, and Mrs. Williams and her husband went into the room and they found Savoy stiff but still breathing, and Mrs. Williams tried to turn him over, and Savoy died.

At about 7 o'clock on August 21, 1914, Dr. Gray received word that Savoy was dead, and, coming to the room of deceased he found him stiff in death in the contraction of violent convulsions, with his hands on the bed rods and his head drawn up through the rods of the bed, in a perfectly rigid position. These conditions and all the symptoms found by Dr. Gray in his treatment of the deceased and in the body of deceased after death showed that he had come to his death by strychnine poisoning.

On the same day, August 21, 1914, Fred Lancaster, chief of police of San Antonio, hearing of the death of Savoy, went to the room occupied by the deceased and the defendant, and on talking with the defendant she gave him permission to examine the rooms. He questioned her, and she produced some three hundred and odd dollars in a black purse, which she said belonged to Savoy.

Lancaster questioned the defendant further about any other money, and she then produced from her stocking twenty-one hundred dollars in currency, twenty-eight $50 bills, and seven $100 bills. Lancaster then questioned the defendant about a will, and she at first said it was down on Aransas Street, where she had had a room, but on being questioned more closely the defendant pulled off her shoe and had the will in the bottom of her shoe. This will was the same will written by T. M. West and was later probated by the defendant through her attorney, L. B. Camp, and she claimed all the estate of Savoy thereunder, but claimed the $2100 as a gift causi mortis.

After the death of Savoy an autopsy was performed on the body, and experiments made with some of the contents of the stomach, and also analysis of some one-half of the contents of the stomach (the other half being lost in the operation), and it was found that the one-half of the contents of the stomach analyzed contained three-fifths ($\frac{3}{5}$) of a grain of strychnine sulphate. It was further established by the testimony of the physicians that the strychnine left in the stomach of any person dying from strychnine poisoning is not the strychnine that produced the death of the person. That strychnine which has produced his death is that portion of the strychnine taken which has been absorbed into the system, and the residue left in the stomach has nothing to do with his death except as an indication pointing to the cause of death.

Defendant did not introduce any evidence.

*L. B. Camp* and *L. A. Lawhon,* for appellant.

*C. C. McDonald,* Assistant Attorney General, and *Joe H. H. Graham,* Assistant District Attorney, for the State.—On question of confessions and declarations of the defendant: Stayton v. State, 27 S. W. Rep., 38; Norseworthy v. State, 77 S. W. Rep., 803; Connell v. State, 75 S. W. Rep., 512; Bain v. State, 79 S. W. Rep., 814; Hickman v. State, 145 S. W. Rep., 914; Hiles v. State, 163 S. W. Rep., 717.

As to declarations of defendant under arrest when fruits of crime are found: Campbell v. State, 57 S. W. Rep., 283; Elizabeth v. State, 27 Texas, 329; Jones v. State, 96 S. W. Rep., 930.

HARPER, JUDGE.—Appellant was convicted of administering strychnine poison to Eugene Savoy in sufficient quantity to cause his death. That Savoy died of strychnine poisoning is shown beyond peradventure of a doubt, but appellant earnestly insists that the evidence is insufficient to show that she administered it to him.

An able presentation of both the theory of the State and defendant

is made by the attorney for the defendant and the attorneys for the State. After a careful review of the testimony we are of the opinion the circumstances shown are sufficient to sustain the verdict. The court instructed the jury that it was a case depending on circumstantial evidence in a well prepared charge. Appellant makes no complaint of the charge, and viewing the evidence as we do we will not disturb the verdict. ·

There are several bills of exception in the record, the first complaining that Herman Nester was permitted to testify as to his opinion as to how much strychnine sulphate would produce the death of a man. The witness qualified as an expert, being a graduated chemist of several years experience, and at the time he testified being city chemist of the City of San Antonio. He made the analysis of the stomach of the deceased and testified to the finding of six-tenths of a grain of strychnine sulphate in the body of the dead man.

One of the contentions made by appellant was that deceased was a sickly man, and, therefore, may have committed suicide on account of despondency caused by his ill-health. The evidence shows that deceased and appellant became acquainted in June, and that they lived together from about July 3 until the day of his death. Appellant objected to Henry Fink, Jr., being permitted to testify that deceased had been in his employ for nearly a year, extending up to June 25th, when deceased was excused on leave of absence. That during all the months deceased was in his employ he never lost a day on account of sickness or any other cause. The court did not err in admitting this testimony.

Appellant, at the time she and deceased rented rooms from one of the witnesses, told the witness that deceased was a millionaire. After his death she said deceased was a pauper and would have to be buried by the city, at the same time saying she had $30,000 in the Frost National Bank. The record would clearly show she had no such amount of money in that or any other bank, but did have some $2400 of deceased's money in her possession at the time she said he was a pauper. This being a case depending on circumstantial evidence, the testimony was admissible, for as said by this court in Noftsinger v. State, 7 Texas Crim. App., 301, in a case depending wholly upon circumstantial evidence, the mind seeks to explore every possible source from which any light, however feeble, may be derived.

Shortly after the death of Eugene Savoy, Officer Lancaster went to his rooming place to make an investigation. He said he found about twenty-four hundred dollars in money. That appellant had some three hundred and thirty dollars in a purse, which appellant claimed was hers. He searched the premises and not finding the remainder of the money, he informed appellant he would take her to the city hall and have her searched. She then admitted she had the money, and reached down in her stocking and handed the officer some twenty-one hundred dollars. She claimed that deceased had given her the money. The officer asked her if she had a will, and she said she had, but that it

was at a residence near the San Antonio & Aransas Pass depot. Later she pulled off her shoe and took the will out of the bottom of the shoe. Appellant objected to this testimony on the ground that she was under arrest. There is nothing in the record to show that she was then under arrest, nor that she was arrested on that occasion even after the money was found. The money was found by reason of her statements made at the time, and this would render the testimony admissible even if she had been under arrest.

There was no error in overruling the motion requesting the court to instruct the jury to return a verdict of not guilty. As hereinbefore stated, the facts and circumstances were sufficient to authorize a verdict of guilty.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied November 17, 1915.—Reporter.]