WILLIE PORTER v. THE STATE.

No. 4833. Decided June 26, 1918.

Rehearing denied October 22, 1919.

1.—Murder—Indictment—Constitutional Law—Words and Phrases.

Where, upon trial of murder, the indictment commenced, "In the name and by the authority of the State of Texas," the same was sufficient, although the word "the" not being contained in the constitution as it is in the statute. Following Moss v. State, 60 Texas Crim. Rep., 68, and other cases.

2.—Same—Indictment—Words and Phrases—Means Used—Pleadings.

Where, upon trial of murder, the indictment alleged that defendant with malice aforethough did kill and murder Emma Staley, "In some way or manner, and by some means, instruments and weapons to the grand

juror's unknown," the same was sufficient, and defendant's motion to quash because the language just quoted did not state the means whereby the alleged murder was committed was correctly overruled. Following Sheppard v. State, 17 Texas Crim. App., 74, and other cases.

### 3.—Same—Jury and Jury Law—Veniremen—Practice in District Court.

Where, upon trial of murder, defendant claimed his attorney had the right to be present while the clerk was drawing the names of the veniremen, in the presence and under the direction of the judge, and to take and make a list of the names as drawn, which was denied by the judge, such contention is untenable, and there was no reversible error. Following Oliver v. State, 70 Texas Crim. Rep., 140, and other cases.

### 4.—Same—Jury and Jury Law—Names of Veniremen—Service of Writ.

Where, upon trial of murder, there was a variance in the initial letters of certain juror's names between those drawn as veniremen and the copy of the writ served upon defendant, but it appeared from the record that these jurors had been excused by the court without objection by defendant who did not exhaust his challenges, there was no reversible error. Following Melton v. State, 71 Texas Crim. Rep., 130, and other cases.

### 5.—Same—Evidence—Tracks—Opinion of Witness.

Upon trial of murder, where the evidence was wholly circumstantial, there was no error in admitting testimony that some ten days after the alleged homicide tracks were found at different places made by small shoes with sharp heels pointing in a certain direction from where the deceased was last seen towards where her dead body was found, and that her shoes showed that the heel part of the tracks appeared to have been made by a shoe about the same size of the heel, etc. Following Noftsinger v. State, 7 Texas Crim. App., 322, and other cases. Davidson, Presiding Judge, dissenting.

### 6.—Same—Jury and Jury Law—Postponement—Special Venire.

Upon trial of murder, where the record showed on appeal that defendant was served with a writ containing the names of the veniremen some two days before the trial was set, there was no error in overruling a motion to postpone the trial in order to give the attorneys additional time in investigate these veniremen; it appearing that the attorneys for defendant had lived in the county for a number of years and were reasonably well acquainted with the veniremen, and besides the defendant did not exhaust his peremptory challenges, and had one day's service of the writ of the special venire.

### 7.—Same—Evidence—Letters—Circumstantial Evidence.

Upon trial of murder, where the conviction depended wholly upon circumstantial evidence, there was no error in admitting testimony to the effect that deceased shortly before her death wrote and mailed letters properly addressed to defendant; the evidence showing for the State that defendant was the caused of deceased's pregnancy, and had arranged to take her away secretly at night to a place where she could be delivered of the child. Davidson, Presiding Judge, dissenting.

### 8.—Same—Evidence—Suicide—Circumstantial Evidence—Acts of Deceased.

Where, upon trial of murder, the defendant contended that deceased committed suicide, there was no error in admitting testimony that deceased, several days before the homicide and up to the time she left home on the night of her alleged death, was in good humor and spirits.

**9.—Same—Sufficiency of the Evidence—Function of the Jury.**

Where, upon conviction of murder, the guilt of the defendant was established wholly by circumstantial evidence, the question was one of fact for the jury, and there was no reversible error. Davidson, Presiding Judge, dissenting.

**10.—Same—Evidence—Opinion Testimony—Withdrawal of Testimony.**

Where, upon trial of murder, the conviction depended wholly upon circumstantial evidence, and the State introduced a physician who with others had examined the body of deceased soon after it was found some ten days after the alleged homicide, who testified that he could not tell whether death had been produced by choking or strangulation, but stated that it was his opinion based on what another physician had said, who had examined the body, that deceased had died from strangulation or from choloform, and said other physician testified the next day that he had not found such condition, whereupon said testimony as to the opinion of the first physician was withdrawn, there was no reversible error. Davidson, Presiding Judge, dissenting.

**11.—Same—Argument of Counsel—Practice in District Court.**

Where, upon trial of murder, the defendant objected to the argument of counsel based upon the opinion testimony which had been withdrawn by the court, and the court sustained said objection, reprimanded State's counsel and properly charged the jury not to consider said argument, there was no reversible error. Following Miller v. State, 31 Texas Crim. Rep., 609. Davidson, Presiding Judge, dissenting.

**12.—Same—Evidence—Declarations by Deceased—Absence of Defendant.**

Where, upon trial of murder, the conviction depended wholly upon circumstantial evidence defendant claiming an alibi, there was no error in admitting testimony in the absence of defendant, showing the declarations and acts of the deceased on the night of the alleged homicide, in packing her grip and telling her mother that she was going to meet the defendant at a certain place that night and that he would take her away to a certain place; it having been shown that deceased and defendant met at said place and time on said night and that deceased was not seen thereafter alive; to explain her presence at said place, etc. Following Bozanno v. State, 60 Texas Crim. Rep., 507, and other cases, distinguishing Brumley v. State, 21 Texas Crim. App., 222. Davidson, Presiding Judge, dissenting.

**13—Same—Motion to Quash—Special Venire—Practice on Appeal.**

Where the trial court overruled a motion to quash the special venire, after hearing evidence thereon, and it appeared from the record on appeal that such evidence was not preserved by a statement of facts and filed during term of court, the same cannot be considered. Following Reyes v. State, 81 Texas Crim. Rep., 588, 196 S. W. Rep., 533, and other cases.

**14.—Same—Circumstantial Evidence—Requested Charges.**

Upon trial of murder, where the conviction depended wholly upon circumstantial evidence, the court charged the law in a proper manner, there was no error in refusing requested charges on the same subject.

**15.—Same—Charge of Court—Practice in District Court.**

Upon trial of murder, there was no error in the charge of the court that counsel for both parties had no right to discuss any fact or circumstance not in evidence, and that the jury should not consider such argument.

**16.—Same—Identity of Defendant—Contradicting Witness.**

Where, upon trial of murder, depending wholly upon circumstantial evidence, the mother of the deceased testified that she saw deceased go with defendant from a certain place on the night she was last seen and upon which it was claimed the homicide occurred, and upon cross-examination testified that on the night, soon after the body of the deceased was recovered, she had stated to the district attorney she could not swear it was defendant who took her daughter away but that he had his general appearance, there was no error in permitting the sheriff to testify that she stated to him that it was defendant she saw on said night. Davidson, Presiding Judge, dissenting.

**17.—Same—Evidence—Impeaching Witness—Declaration of Third Party.**

Where, upon trial of murder, the conviction depended wholly upon circumstantial evidence, defendant pleading an alibi, and introduced his brother to sustain the same, there was no error in admitting testimony as to the declaration made by said brother to the sheriff on the night he arrested defendant, to the effect that he asked the sheriff if there was anybody with him who would hurt the defendant, the said witness denying said declaration, whereupon the State introduced the sheriff who testified that said brother of the defendant did make such declaration; it appearing that defendant heard the same at the time, etc. Following Robbins v. State, 73 Texas Crim. Rep., 367, and other cases. Morrow, Judge, considering same harmless error. Davidson, Presiding Judge, dissenting.

**18.—Same—Evidence—Animus of Witness—Charge of Court—Collateral Matter.**

The animus, bias and interest, etc., of any witness can always be shown and such testimony is never collateral, and there was no error in admitting the testimony of the declaration and acts of defendant's brother at the time of defendant's arrest, thus showing his interest in defendant's behalf, especially where the court instructed the jury that they could only consider this testimony in determining the credibility and the weight to be given to the testimony of said defendant's brother. Morrow, Judge, considering this harmless error. Davidson, Presiding Judge, dissenting.

**19.—Same—Rehearing—Jury Wheel Law—Statutes Construed—Open Court.**

Former article 647 C. C. P., with reference to drawing the jury in open court, has been specifically amended by the Act of 1907, known as the jury wheel law, besides, the record showed on appeal that the venire was drawn in open court and the only fact relied upon as showing that it was not was that counsel for defendant, at the request of the court, absented himself from the court-room; in this there was no reversible error.

**20.—Same—Copy of Special Venire—Challenges—Practice on Appeal.**

Where the record showed on appeal that the jury was selected from the regular venire and that defendant did not exhaust his challenges, his contention that he was injured by not being permitted to have a copy of the venire sooner, is without merit.

**21.—Same—Evidence—Tracks—Opinion of Witness.**

Upon trial of murder, there was no error in admitting testimony that in a field several miles from the place where the body of the deceased was found, and at a point near where it is claimed deceased met defendant on the night of the alleged homicide, and at a time some two weeks subsequent to the disappearance of deceased, tracks were found made by a woman's shoe similar to tracks which would be made, in the opinion of the witnesses, by shoes worn by the deceased when she left home, under the facts of the instant case. Davidson, Presiding Judge, dissenting.

**22.—Same—Evidence—Letters—Illicit Relations.**

The testimony as to letters seen in deceased's possession, addressed to defendant since his marriage, and that similar letters ·went through the mails, were admissible as a circumstance showing the continuation of ilicit relations of the parties subsequent to said marriage. Davidson, Presiding Judge, dissenting.

**23.—Same—Charge of Court—Argument of Counsel.**

A charge of the court which instructed the jury that counsel on either side had no right to discuss any fact or circumstance not in evidence, did not deprive the defendant of the benefit· of arguing and discussing the facts and circumstances in the case.

**24.—Same—Evidence—Impeaching Witness—Collateral Matters—Motive.**

Upon trial of murder, where the conviction depended wholly upon cir-cumstantial evidence, and where the brother of the defendant denied making the declaration on the night of defendant's arrest whether there was any-one with the sheriff who would hurt defendant, the State thereupon intro-ducing the sheriff as a witness to testify that such declaration was made at the time, a proper predicate having been laid, there was no reversible error, and the motives of said witness cannot be regarded as immaterial or collateral matters. Following Green v. State, 54 Texas Crim. Rep., 3, and other cases. Davidson, Presiding Judge, dissenting.

**25.—Same—Evidence—Declarations of Deceased—Res Gestæ.**

The declarations made by deceased to her mother, while she was packing her clothes, preparatory to leaving home on the night of her disappearance, etc., in addition to the reasons given in the original opinion were res gestae, and admissible in evidence. Following Upton v. State, 48 Texas Crim. Rep., 289, and other cases. Davidson, Presiding Judge, dissenting.

**26.—Same—Corpus Delicti—Sufficiency of the Evidence.**

Where, upon trial of murder, the conviction depended entirely upon circumstantial evidence, and the facts surrounding the death of the de-ceased were such as to make it necessarily a suicide or a death resulting from the criminal agency of another, and the facts showed that the theory of suicide was made impossible, and that the jury was justified to find that the defendant was the guilty agent in causing such death, there was no reversible error. Davidson, Presiding Judge, dissenting.

Appeal from the District Court of Bell. Tried below before the Hon. F. M. Spann, judge.

Appeal from a conviction of murder; penalty, life imprisonment in the penitentiary.

The opinion states the case.

*J. B. Hubbard, DeWitt Bowmer, G. M. Felts,* and *W. W. Hair,* for appellant.—On question of drawing special venire: Brown v. State, 54 Texas Crim. Rep., 121, 112 S. W. Rep., 80; Smith v. State, 113 S. W. Rep., 289; Northern Traction Co., v. Danforth, 53 Texas Crim. App., 419, 116 S. W. Rep., 147; Asbeck v. State, 70 Texas Crim. Rep., 225, 156 S. W. Rep., 925.

On question of testimony as to tracks; Mosely v. State, 67 S. W. Rep., 103; Smith v. State, 77 id., 489; Tankersly v. State, 51

Texas Crim. Rep., 224, 101 S. W. Rep., 234; Ballenger v. State, 63 Texas Crim. Rep., 657, 141 S. W. Rep., 91.

On question of admitting letters in evidence; Taylor v. State, 47 Texas Crim. Rep., 101.

On. question of withdrawing illegal testimony: Collins v. State, 75 Texas Crim. Rep., 534, 171 S. W. Rep., 729; Henard v. State, 46 Texas Crim. Rep., 90; McCandless v. State, 42 id., 58; Miller v. State, 31 id., 609; Barth v. State, 39 id., 381.

On question of impeachment of defendant's brother: Skeen v. State, 100 S. W. Rep., 770; Williford v. State, 37 id., 761; Holland v. State, 60 Texas Crim. Rep., 117, 131 S. W. Rep., 563; Ballard v. State, 71 Texas Crim. Rep., 587, 160 S. W. Rep., 716.

On question of declarations of deceased: Cases cited in dissenting opinion.

On question of *corpus delicti* not being proved: Lovelady v. State, 14 Texas Crim. App., 545; Robinson v. State, 16 id., 347; Harris v. State, 30 id., 549; Conde v. State, 35 Texas Crim. Rep., 98; Follis v. State, 51 id., 186.

*E. A. Berry,* Assistant Attorney General, for the State.

PRENDERGAST, Judge.—Appellant was convicted of the murder of Miss Emma Staley and his punishment assessed at life imprisonment.

The commencement of the indictment is: "In the name and by *the* authority of the State of Texas." This is in literal compliance with the statute (Art. 451 C. C. P). The Constitution, (Art. 5, sec. 12) is: "  .  .  .  The style of all writs and process shall be, 'The State of Texas.' All prosecutions shall be carried on in the name and by authority of the State of Texas and shall conclude: 'against the peace and dignity of the State.' " The word "the" is not contained in the language of the Constitution before the word "authority," as it is, and required by, the statute. Said language in the Constitution—in the name and by authority of the State of Texas, is not in quotation. The words in the statute are in quotation; nor are said words in quotation as are the words required in the style of all writs and process, and in the conclusion of an indictment.

In Moss v. State, 60 Texas Crim. Rep., 268, a motion to quash the indictment therein because the word "of" was inserted in the language—"in the name *of* and by authority of the State of Texas," the motion was held to have been correctly overruled. In that case the word "the" was also used before the word "authority," just as in this indictment. What was said and held in said Moss case as to the insertion of the word "of" is specially applicable herein as to the word "the." The court correctly held the indictment here-

in was not invalid because of the insertion of said word "the," and in overruling appellant's motion to quash on that ground.

After the other usual allegations, the indictment averred that appellant with malice aforethought did kill and murder Emma Staley "in some way or manner, and by some means, instruments and weapons to the grand jurors unknown." Appellant's motion to quash because the language just quoted did not allege the means whereby the alleged murder was committed was correctly overruled. Walker v. State, 14 Texas Crim. App., 609; Sheppard v. State, 17 Texas Crim. App., 74. In the Walker case this identical language was used, and the indictment held valid. The court said: "It is well settled that it is sufficient to allege that the murder was committed 'in some way or manner, and by some means, instrument and weapons, to the jurors unknown.' (Com. v. Webster, 5 Cushing's Rep., 295; State v. Wood, 53 N. H., 484; State v. Burke, 54 N. H., 92; State v. Williams, 7 Jones N. C., 446; People v. Cronin, 34 Cal., 191; People v. Martin, 47 Cal., 101; Com. v. Martin, 125 Mass., 394; 1 Whar. Prec., 114; Whar. Cr. Ev., sec. 93; 1 Arch. Cr. Prac. and Pl., note 1.)"

When the clerk was drawing the names of the veniremen, in the presence and under the direction of the judge, appellant claimed his attorney had the right to be present and to make and take a list of the names as drawn, which was denied by the judge. He cites only Article 647, White's An. C. C. P. as authority, because it prescribed that said drawing shall be "in open court." This Article, as contained in Judge White's book was afterwards amended by the Act of 1907, p. 271, and said words "in open court" were omitted, (Said Art. is now 660 in the C. C. P.) thereby clearly showing the Legislature intended to change the statute, and did change it, so that the drawing could be done by the clerk in the presence of the judge alone, and that this did not have to be done "in open court." Appellant's attorney had no right to be present and take the names as drawn (Oliver v. State, 70 Texas Crim Rep., 140 and cases there cited). The law prescribes the names shall be furnished him (Art. 671 C. C. P.) by service of a writ on him giving the names of the veniremen served.

The writ of venire for the 125 drawn veniremen included these four names viz., *O.* L. Lindeman, A. *E.* Pagel, C. C. Lancaster, and *O* F. Winkler. The sheriff's return showed he had served them. In copying the names to serve on appellant these were given as *G.* L. Linderman, A. *S.* Pagel, C. C. Lancaster and *C.* F. Winkler Thereupon appellant moved the court to quash the service of the writ on him, which was overruled. The court, in approving the bill, qualified it by stating that these four persons—whichever were their correct names—were excused by the court, that appellant was not required to, and did not, pass on either of them, nor use his challenge on

either, that he made no objection to their being so excused, nor did he ask for an attachment for either of them under either name, and that he did not exhaust his challenges.

Judge White in his An. C. C. P., sec. 721, says: "Mere discrepancies in some of the names as stated in the copy and the original will be immaterial where it appears that the parties named did not serve on the trial, and defendant did not exhaust his peremptory challenges. Bowen v. State, 3 Texas Crim. App., 617. If there is a variance between the name set out in the copy and the original, the proper practice is to stand such veniremen aside. Mitchell v. State, 36 Texas Crim. Rep., 278; Hudson v. State, 28 Texas Crim. App., 323; Thompson v State, 19 Texas Crim. App., 593; Swofford v. State, 3 Texas Crim. App., 76; Bowen v. State, 3 Texas Crim. App., 617." Melton v. State, 71 Texas Crim. Rep., 130. The court's action herein was correct.

The State's testimony showed that deceased left her home on the night of March 12th and in some distance therefrom met appellant near a straw stack, and left with him going in a certain direction which he pointed and which it seems was towards where her dead body was found in the river on March 21st. On March 22nd Mr. Durrett went on the ground at the hay stack, and again on March 26th he and Mr. Smith the sheriff, went there and hunted for tracks leading away from there. They each were permitted over appellant's objection to testify in substance that they found tracks, at different places, made by small shoes with sharp heels, the toes pointing in a southerly, and the heels in a notherly direction (which was from towards said hay stack, and towards where her body was found.) The ground had been rained on—a light shower—since the tracks were made. The shoes from deceased's feet were then shown the witness and Mr. Durrett testified the heel part of the tracks appeared to have been made with a small heel and as near as he could judge, about the size of the heel of the shoe. The sheriff's evidence was to the same effect.

This evidence was admissible. The testimony to establish guilt was wholly circumstantial. When this is the case it has always been held, "the mind seeks to explore every possible source from which any light, however feeble, may be derived." Noftsinger v. State, 7 Texas Crim. App. 322; Early v. State, 9 Texas Crim. App., 476; Simms v. State, 10 Texas Crim. App., 131; Bailey v. State, 144 S. W. Rep., 1005; Belcher v. State, 71 Texas Crim. Rep., 646, 161 S. W. Rep., 459; Durfee v. State, 73 Texas Crim. Rep., 165, 165 S. W. Rep., 180; Archer v. State, 74 Texas Crim. Rep., 524, 168 S. W. Rep., 857; Hand v. State, 77 Texas Crim. Rep., 623, 179 S. W. Rep., 1155; and "the command of the law is turn on the light." Preston v. State, 8 Texas Cr. App., 30; Harris v. State, 31 Texas Crim. Rep. 411.

The writ, with the names of the veniremen, was served on appellant about 5 o'clock June 25th. The case was set for trial June 27th. Appellant made a motion to postpone the trial for one, two, or three days in order to give him and his attorneys additional time to investigate these veniremen. The motion was of considerable length and set up many matters along this line. The court heard evidence on it and after doing so correctly overruled it. The judge allowing the bill, qualified it by stating that Mr. Hare, one of appellant's attorneys, had lived in said county fifty years, had practiced law therein for twenty-five or thirty years and had been county and district attorney therein; that Mr. Hubbard, another one of his attorneys, had resided in said county for about twelve years and practiced law therein during that time; that Mr. Felts, another one of appellant's attorneys, had resided in the county some twenty or twenty-five years during most of which time he had practiced law therein and had been county judge; that the other attorney of appellant, Mr. Bowmer had practiced law in the county for five or six years and had been district attorney; ''and from the evidence adduced in the case the court found that all of these attorneys were reasonably well acquainted with the venire and that they did not all know the same veniremen, but the defendant had the benefit of the knowledge of four attorneys.'' And further, that he did not exhaust his peremptory challenges, having two left when the jury was completed.

The statute (Art. 672 C. C. P.) expressly provides that in this character of case one day's service of a copy of names of persons summoned under the special venire shall be sufficient. In this case he practically had two days and was unusually well equipped with experienced attorneys who had more than ordinary knowledge of the persons summoned. The court committed no error in overruling this motion.

The State introduced testimony showing that appellant for some two years had been having sexual intercourse with the deceased, and that she was pregnant by him at the time of her death with the fetus five or six months old. Appellant had married another woman on Nov. 22, 1916. The State introduced other testimony to the effect that appellant had seen and had sexual intercourse with deceased, after said marriage and was in communication with her. He was shown to have been in earnest private conversation with her in Belton at a retired place Saturday evening before she was killed, if she was, on Monday night following. Appellant denied all this. The theory and contention of the State was that appellant was informed by deceased that she was pregnant by him, and that appellant arranged with her to secretly at night take her away to another place some distance from her home where she could be delivered of the child without publicity or to produce, or have produced, an abortion on

her; that he arranged with her to meet him near said hay stack on the night she left home and carry out that plan, but instead of doing so that night soon after he got her away from home he killed her, and placed her body in deep water in the Leon River so as to cover up and hide his crime. Appellant contended that he did not kill deceased nor meet her at the hay stack and take her away therefrom: but that she voluntarily committed suicide.

As stated, his guilt, if he was guilty, had to be established by circumstantial testimony. Hence the court committed no error in admitting the testimony of Mrs. Staley, deceased's mother, and Miss Miller and Mr. Tulloch, the mail carrier, to the effect that deceased shortly before her death, and after appellant's said marriage wrote and mailed his letters properly addressed to him at his postoffice address. This was a circumstance from which the jury would be authorized to believe that he received such letters, that deceased was in communication with him about her condition, and thereby an interview was arranged at Belton and arrangements made for him to take her away.

Under the issues herein and the contentions of each side the court did not err in permitting several witnesses to testify, over his objections, that deceased was cheerful, in a good humor, jolly and apparently in good spirits for several days continuously before she left home the night she did. This testimony would tend to disprove appellant's contentions that deceased committed suicide.

The statement of facts is very voluminous—319 typewritten pages. The other record is also quite voluminous. The testimony on several material points is directly in conflict. The credibility of the witnesses and the weight to be given to the testimony was exclusively for the jury. The evidence to establish appellant's guilt is wholly circumstantial. It would be out of the question to give here the whole testimony or even all of the many facts and circumstances tending to show his guilt. It is unnecessary to give the evidence which would tend to show he was not guilty, for in determining whether the evidence is sufficient to sustain a conviction it is necessary to look only to the incriminating testimony and the reasonable inferences therefrom. A brief summary of some of the incriminating testimony and conclusions to be drawn will be given.

Appellant was a young man some twenty-five or twenty-six years old when he became acquainted with deceased and lived a few miles from Belton. She then was a young girl eighteen or nineteen years old and lived with her parents, who also lived a few miles from Belton. He waited on and kept company with her for some years before and up to the time he married another woman. He married the other woman November 22, 1916. After he had been waiting on deceased for a while he succeeded in having her to have sexual intercourse with him. He had other acts of intercourse with her more or less frequently as he had opportunity up to about the time he

married the other woman, and at least one, if not more times, after his marriage. One witness testified he saw appellant in a buggy with deceased off of the road one night about nine o'clock sometime after his marriage. Another witness testified that sometime after appellant's marriage, he, appellant, tried to get the witness to get deceased out from her home so that he could get to see her and be with her. Appellant saw deceased at her home about January 20, 1917, when he went there and got a load of corn. At the time he thought she was there alone, but her sister was in the house unseen by him. Her sister testified that deceased went out to the lot where appellant got the corn and told such a state of facts as to show he at that time had sexual intercourse with deceased. Another witness swore that appellant admitted to him that he did have sexual intercourse with deceased on that occasion.

Appellant's intimate friend, John Graves, swore that just shortly before the Bell County Fair, which was held on Oct. 4th to 9th 1916, appellant told him he had gotten deceased into trouble—in family way, and asked his advice. He told him to either marry her, or get up and leave the country. Appellant told him he did not want to marry her and would not do so, and promptly skipped out of West Texas. His other intimate friend, W. F. Cowan, swore that appellant told him he thought deceased was in family way and he did not intend to marry her, and gave that as a reason why he was leaving. He remained away sometime until he was advised she was about all right, when he returned. Appellant himself admitted substantially what his two friends swore except that he claimed the time he skipped out because he had gotten deceased pregnant that time was in 1915 and not in 1916 as they swore. He also admitted getting letters from her in September and October, 1916, wherein she told him of her pregnancy by him, claiming that the last letter he received was dated October 25, in which she informed him she was all right again. He did not produce any of the letters she had written him. One of his brothers swore positively that *appellant* burned said October 25th letter in his house in Belton on the night of October 26th and did not take the letter with him in his trunk when he left his house. Appellant's wife swore that sometime after she married appellant, which was on Nov. 22, 1916, she found that letter in his trunk, read it, and then *she* burned it. Appellant is shown to have been with deceased early in September and also early in October, and to have had sexual intercourse with her on both occasions. The night after deceased's body was found late in the evening, the undertaker and doctor opened her body and found a well developed foetus—child—in her womb which they swore was five or six months old. There can be no doubt that appellant got her pregnant.

Shortly before her death deceased is shown to have written letters to appellant and mailed them to his postoffice address. On Saturday

3—68 T. C. R.

evening, March 10th, deceased and appellant were both in Belton. It was clearly shown by several witnesses that they were seen together that evening engaged in earnest conversation at a retired place near a church, away from the frequented and most traveled streets. The facts and circumstances make it clear that he knew that deceased was pregnant by him at the time, and that she was making it plain to him that he must come to her immediate relief and in some way protect her from exposure and disgrace, and doubtless himself from great trouble because she was pregnant by him. Nor can there be any doubt but that he at the time of the interview at the church arranged with her to meet her near her home the following Monday night. On that Monday night, about nine o'clock deceased packed in a laundry bag and a small hand grip considerable of her wearing apparel and toilet articles and then began to dress herself to leave. While dressing she told her mother she was going to meet appellant at a certain hay stack several hundred yards from her home and was going to Nolanville to take the train for San Angelo; that she supposed he would bring a buggy to take her from there to Nolanville but she didn't know whether a buggy or a car, she supposed a buggy. About 11 o'clock that night deceased went from her home to near said hay stack, taking with her her bag of clothes and hand grip. Her mother and sister accompanied her to within a short distance of the hay stack. They then stopped at a secluded place to watch. Deceased waited a while at the hay stack for appellant to arrive. When he approached he whistled. She was then sitting on her laundry bag and when he whistled she stood up and he came to her, put his arms on her shoulders and kissed her. They talked in a low tone which could not be understood by her mother and sister though they heard them talking. They saw him motion in the direction they intended to go and he then picked up her baggage, and they walked away in the general direction of where her dead body was found nine days later in deep water in the Leon River. Her body was found in said river dressed in the same clothes and way she was when she left home. Her legs, just below the knees, had been securely bound together by bailing wire wrapped around tight, and the ends twisted together to the left and a little back from the side of her leg. Her legs were so securely and tightly bound as to prevent walking. She could not have moved one foot before the other. Her body when found was some 150 feet more or less up stream from a high bridge that crossed the river. It seems that some distance below the bridge the river was dammed so the water company could get a supply of water. The bridge was forty feet or more above the water under it. The water at this point and for some distance above was ten, twelve or more, feet deep. Her body when found was in a very bad state of decomposition. The contents of her stomach and other physical facts showed that her death occurred very soon after appellant left the hay stack with her. No doctor or other witness testified specifically

how her death was caused. All the physical and other facts were
sufficient to show she did not commit suicide, but that her death was
caused by violence. In effect, appellant is shown to have been the
only person who had any motive or opportunity to kill her, and
that he must have killed her soon after he left the hay stack with her,
and then bound her legs and bag of clothing and threw them in the
river to conceal his crime.

Ollie Moore swore that on Monday before deceased's body was
found the following Wednesday, he saw appellant going up and down
said river bank about where her body was found, two or three times
as if he was hunting for something.

Appellant has two bills on the same subject. In one it is shown the
State introduced Dr. Crain who, with others, had examined the body
of deceased soon after it was found. Among other things he testified
that the body was in such a state of decomposition, death having
occurred so long before, that, "I could not tell if death had been
produced by choking or strangulation." He gave no other opinion
of his own knowledge derived from an examination of her body
as to what caused her death. However, over appellant's objection,
he further testified: "My opinion, based on what Doctor Robinson
said was the condition of her brain, that is, that it was congested,
is that she died either from strangulation or from choroform. I will
qualify that statement by saying I did not see the brain myself.
I understand Doctor Robinson said he found the brain to be con-
gested." Dr. Robinson had not then testified, but did testify the
next day. He said he did not find her brain in the condition on
which Dr. Crain had based his opinion as to the cause of her death.
Thereupon as soon as Dr. Robinson had testified appellant moved
the court to exclude said testimony of Dr. Crain. The court granted
the motion, and instructed the jury to disregard Dr. Crain's said
testimony and not consider it.

His other bill shows that in the argument before the jury by an
attorney assisting the State he said: "Dr. Crain has testified that
in his opinion the death of Emma Staley was caused by either chloro-
form or strangling." Appellant immediately, by his attorney, ob-
jected to this argument and requested the court to admonish said
attorney and reprimand him for this, and to instruct the jury to
disregard this statement. The court promptly complied with the
request of appellant, sustained his objections to the said remark,
reprimanded the attorney, and then verbally instructed the jury
to disregard that statement, and in addition gave a written instruc-
tion asked by appellant, telling the jury to disregard the remark of
said attorney for the reason that there was no such testimony before
them and not to consider said remark at all in making up their
verdict.

The bill and record clearly show that said objectionable testimony
by Dr. Crain was based on what he had heard Dr. Robinson had

said about the condition of the brain of the deceased, and on that alone. Further, that it was shown by Dr. Robinson that he had made no such statement as to the condition of the deceased's brain, and as soon as this was shown, and it was conceded by all parties, the said objectionable testimony by Dr. Crain was withdrawn from the jury, and they were instructed not only verbally at the time but also in writing to wholly disregard it as well as the remark of the State's attorney.

In Miller v. State, 31 Texas Crim. Rep., 609 wherein he was convicted for murder with the death penalty assessed, the court, through Judge Davidson, held that the weight of authority was that, the effect of withdrawing and excluding testimony erroneously admitted, which was or may have been prejudicial in its nature and tendency, cures the error, and says that such has been the opinion entertained by this court, citing several authorities. And he said: ''To hold otherwise would be to sanction the doctrine that the court could not cure any error into which it may have fallen by mistake or inadvertence, and thus render it helpless to rectify errors committed, and the trial a mockery and farce. We cannot sanction such a doctrine.'' This case has many times been cited, quoted and approved by this court.

In Hatcher v. State, 43 Texas Crim. Rep., 237, the court therein erroneously admitted the testimony of a witness who swore, in substance, that while he and the appellant therein were in jail together appellant proposed to him to falsely swear to facts on his behalf constituting an alibi. After this testimony was admitted the court realized that he had made a mistake because the appellant therein had not been properly warned. He thereupon withdrew that testimony and instructed the jury not to consider it. Appellant therein claimed that this testimony was of such a damaging character as the withdrawl of the testimony would not cure the error, but this court therein, by Judge Henderson, held against him, Judge Henderson saying, that the decisions of this court on the subject were at variance, and ''Some of the cases hold that the exclusion of such testimony will not cure the error, while others hold the contrary. In such a conflict, the true rule would seem to be that if the admitted testimony is of such a damaging character as to suggest the impossibility of withdrawing the impression produced on the minds of the jury, and thus curing the error, it will be cause for reversal; otherwise, if the testimony is not of that damaging character, and not likely to influence the jury, it can be withdrawn, and the error of its admission thereby cured.'' Taking this whole matter as shown by these bills, they do not show reversible error under the authorities.

The state showed by the testimony of several witnesses, as stated above, that appellant was seen in earnest and private conversation with deceased in Belton Saturday evening at a rather retired or secluded place; that after this interview between them they returned

to their homes;· that on the following Monday night she packed quite a lot of·her wearing apparel and toilet articles in a laundry bag and in a small hand grip and dressed herself to leave.

One of appellant's bills shows that her mother was asked these questions and answered them over his objections: "Q. While deceased was dressing to go what did she say to you as to where she was going, if anything?   A.   She told me she was going to meet Willie Porter at the hay stack.   Q.   Where did she say she was going to, if anywhere?   A. From there to take the train to Nolanville, to take the train.   Q.   To go anywhere? A.   To go to San Angelo, to take the   train at   Nolanville   for   San   Angelo. Q   Did she state how they were to go from the hay stack to Nolanville?   A.   She said she supposed Willie Porter would bring a buggy, she did not know, a buggy or a car, she supposed a buggy.   Q.   When did deceased tell you this?   A.   She told me this about 9 o'clock on the night of March the 12th while she was dressing.   Q.   About how long after that was it before she left home?   A.   About two hours."

In this connection, as stated above, deceased's mother and her sister both, in substance, testified they went with deceased several hundred yards distant from their home near to said hay stack, about 11 o'clock that night; that they stopped near by, at a point secluded, and waited—deceased went on nearer to the hay stack; that while waiting they saw appellant go to deceased and have some conversation with her. They could hear them in conversation, but could not distinguish what they said. That while thus conversing appellant pointed in a certain direction, and that thereupon he picked up deceased's baggage and they went in the direction he had pointed; which was in the general direction of where her body was found in the river some nine days later. The bag of clothing and grip were also found in the river near where her body was found with all of the articles of clothing just as they had been packed by deceased at her home preparatory to her leaving therewith. When the body was found she was dressed just as she was when she left home and separated from her mother and sister. Her legs just below the knees were fround wrapped with baling wire, the wire fastened at her left side by twisting the ends together. This bound her legs so tight that it was impossible for her to walk. She could not move one foot before the other. The small grip had been placed in the bag with the clothing and the bag was closed also with bailing wire, and the bag otherwise wrapped with wire. The testimony was clearly sufficient to show that she met her death very soon after she left her mother and sister in company with appellant. Appellant denied killing her and he and his wife, testified that he was at his home during the whole of the night deceased left her home and when she was evidently killed.

Appellant relies upon Brumley v. State, 21 Texas Crim. App., 222, and that line of decisions which in effect hold that where a defendant's defense is self-defense, and deceased had threatened to kill him, that evidence showing that deceased did not go to where the defendant then was for any such purpose or for any unlawful purpose, but instead for a lawful purpose, was inadmissible unless known to the defendant at the time, for it would deprive him of his right to act on apparent danger and appearances to him. We think that line of authorities is not in point and is inapplicable herein. This court, through judge Ramsey in Bozanno v. State, 60 Texas Crim. Rep., 507, clearly showed the distinction. In that case the court over Bozanno's objection, permitted the witness to testify as to the movements, actions and declarations of the deceased on the day prior to the homicide stating: "The cases in which the actions, declarations and intentions of a decedent are held not to be admissible against a defendant who has no notice of them, has always been limited to cases where the issue of self-defense arose in the case, and where such acts and movements of the deceased could be held to be hostile in their character, and where such defendant has a right to act upon an apparent hostile movement towards him which might, if the rule permitted it, be shown to be in fact innocent. It can have, we think, no application to such a case as this, and the objection is wholly untenable." In that case such acts, movements and declarations of the decedent were held admissible.

In West v. State, 2 Texas Crim. App., 460, the acts and declarations of the deceased not in he presence of accused were expressly held admissible, the court saying: "It was competent to prove what he said and did at the time he was in the act of leaving home, on his journey, expressive as to where he was going. Such declarations, made at the time of the transaction and expressive of its 'character, are regarded as 'verbal acts indicating a present purpose and intention,' and are therefore admitted in proof, like any other material facts 1 Greenl. on Ev., sec. 108; 1 Ph. on Ev., 150, title Declarations, part of the *res gestae.*"

In Washington v. State, 19 Texas Crim. Rep., 521, the trial court admitted, over objections, the evidence of two witnesses, of what deceased said to one of them, to-wit: "that the defendant wanted him, witness, to come to his (defendant's) house, on the next morning, and write him, defendant, a letter; witness replied he could not go next morning, but would go that night; whereupon deceased replied that it was no use to go that night, as he, deceased, had seen defendant going down the slough with a shot gun over his shoulder." His objections were that said testimony "was hearsay, irrelevant, and not a part of the *res gestae.*" This conversation between the deceased and the witness was in the absence of the defendant,

and he did not hear it, or know of it, and when concluded deceased himself rode on down to the slough. A shot was soon heard, and later, witness went down, and found the dead body of deceased, killed by shooting him. No one saw who shot him. The evidence to establish defendant's guilt was wholly circumstantial. Defendant was convicted and the death penalty assessed. The case was affirmed. This court, through Judge Hurt held said evidence was admissible, saying that it "tended to show that the defendant was at or near the place of the homicide, and that he had the opportunity and the means of killing the deceased, at the time and in the manner it is shown to have occurred." See also Means v. State, 10 Texas Crim. App., 16; Cox v. State, 8 Texas Crim. App., 254; Tooney v. State, 8 Texas Crim. App., 452; Girtman v. State, 73 Texas Crim. Rep., 168—all in point.

In the Girtman case this court held that the testimony of Mr. Diemer as to what the deceased said to him at night 200 yards away from defendant and not heard or known by defendant, to the effect that he, deceased, called upon Diemer "to come up there and take appellant's pistol away from him and make Fox Williams leave; that they (appellant and Williams) were fixing to kill him (deceased)" was held admissible as *res gestae* of the transaction, wherein Girtman did later kill deceased, citing a number of cases.

In 6 Encyc. of Ev., p. 663, it is said: "Previous to or accompanying departure for scene of homicide: the purpose and intention of the deceased when last seen or when departing for the scene of the crime may be relevant for the purpose of connecting the defendant with the homicide in a circumstantial case, as when the deceased intends or expects to meet the defendant. In such cases declarations by the deceased of his purpose are admitted by some courts as part of the *res gestae,* by others as verbal acts explaining his conduct  .   .   .," citing a large number of cases from other States, and the case of West, *supra.* To the same effect is 11 Encyc. of Ev., p. 424; 2 Jones on Ev., secs. 347-8.

In the case of State v. Howard, 32 Vermont, 380 wherein Howard was prosecuted for killing Olive Ash in an attempt to produce an abortion that court through Chief Justice Reffield held that the declarations of deceased as to her purpose in going to the defendant's where the act of abortion was had upon her were admissible, saying: "The declarations of Olive Ash as to the purpose of going to the respondent's (defendant's) were properly admitted as part of the *res gestae.* The mere act of going was equivocal; it might have been for professional advice and assistance. The declarations were of the same force as the act and were admissible as part of the act."

In the case of the State v. Dickinson, 41 Wis., 299, Dickerson was prosecuted for killing deceased in an attempted abortion on her. Over the accused's objections in that case the court permitted the

witness Mary Erickson to testify that deceased at the time she left, stated she was going to appellant's for the purpose of having an abortion produced on her. The court held that deceased's declarations were admissible, saying: "They constituted a part of the *res gestae,* were contemporaneous with the main fact under consideration, and were so connected with it as to illustrate its character. 1 Greenl. Ev., 108. It was certainly competent to prove that the deceased went to the house of the defendant at the time it was charged in the information the abortion was produced. Upon the authorities, her intent or purpose is going there might be shown by her declarations then made or previously made; because such declarations became a part of the *res gestae.* For it is evident the declarations were connected with the act of her going to the defendant; were expressive of the character, motive, or object of her conduct; and they are to be regarded as verbal acts indicating a present purpose or intention, and therefore are admitted in proof like any other material facts. 1 Greenl. Ev., *supra;* Insurance Co. v. Mosley, 8 Wall, 397; Enos v. Tuttle, 3 Conn., 247; Inhabitants of Corinth v. Inhabitants of Lincoln, 34 Me., 310; Lund & Wife v. Inhabitants of Tyngsborough, 9 Cush., 36; Nutting v. Page, 4 Gray, 581; State v. Howard, 32 Vt., 380; Moore v. Meacham, 10 N. Y., 207; People v. Davis 56 id., 95." In that case the court cites, quotes and approves the decision in State v. Howard, *supra.*

In Harris v. State, 96 Ala., 24, Harris was prosecuted and convicted for the murder of one Lovelace. Shortly before the deceased was killed he started to the house of the appellant where he was killed. The court held that his declarations of the intention to go to said house and the purpose of his going were held admissible. The court said: "His declarations during the time of this discussion indicative of a purpose to find Becky Thomas, and showing that he had been informed she was at the house of the defendant, were properly allowed to go to the jury as a part of the *res gestae* of the transaction, tending to explain and give character to his presence and conduct at defendant's house. They were declarations made by one setting out on a journey, or starting to go to a particular place, explanatory of the objects and purposes he had in view in going to the particular place; and for that purpose were admissible, their weight being a matter for the jury to determine. Kilgore v. Stanley 90 Ala., 523, and authorities there cited."

Each of the following cases held exactly the same way, to-wit: Burton v. State, 115 Ala., 1; State v. Vincent, 24 Iowa, 570; State v. Winner, 17 Kansas, 298; Tilley v. Commonwealth, 89 Va., 136; Thomas v. State, 67 Ga., 460. Other text books and cases from other jurisdictions to the same effect could be cited. See also note 1 Wh. Cr. Ev. 495; Wig. on Ev., Sec. 1726.

Under the circumstances of this case and the authorities the said testimony of Mrs. Staley was admissible.

Appellant made a motion to quash the special venire alleging several matters which he claimed required the court to quash it. The State contested this motion. The court heard evidence thereon and after hearing the evidence overruled the motion, to which appellant excepted. The bill setting up this evidence was not filed till long after the adjournment of the court for the term hence under a great number and uniform decisions of this court it cannot be considered. See Reyes v. State, 81 Texas Crim. Rep., 588, 196 S. W. Rep., 533 where a large number of cases so holding are collated.

The court gave a full and correct charge on circumstantial evidence which was in conformity with such charges universally held correct by this court. Notwithstanding this, appellant requested several charges on the same subject which the court refused because covered by the main charge. The action of the court was correct.

The court did not err in one paragraph of his charge in telling the jury that "counsel for the State nor defendant have any right to discuss with you or refer to any fact or circumstance not in evidence, and you must not consider or in any way be influenced by any remark or the discussion of any fact or circumstance by the counsel in this case when such fact or circumstance is not in evidence." The charge embodies a correct principle and we cannot see how it could have injured the appellant in any way.

Mrs. Staley, deceased's mother, testified in substance that she saw deceased go off with appellant from said hay stack, as more fully given above. On cross-examination of her, appellant, in an attempt to impeach her, had her testify that on the night soon after the body of deceased was recovered, she had stated to the district attorney that she could not swear it was appellant who took her daughter off but it was a small man and had his general appearance. The court therefore did not err in permitting the sheriff to testify that on that night before she made the statement to the district attorney that she stated to him that it was appellant who went off with her daughter on that occasion. Sec. 181, 1 Branch's An. P. C.

Alibi was a defense of appellant. The State's testimony, as given above, shows deceased left her home just about or just after 11 o'clock at night in company with her mother and a sister to meet appellant by appointment, near a hay stack several hundred yards from her home. It must have taken her several minutes to have walked the distance. She waited there sometime before appellant reached her. So that, according to the State's evidence, it must have been about 11:30 or later, when appellant reached her. He testified he played cards at his home that night until 9:30 or 10 o'clock, or something like that and then went to bed, and remained there until next morning. He introduced his brother, R. L. (Pete) Porter, who testified to the card playing and going to bed substantially as appellant did. Further, on direct examination Pete said appellant "did not leave the house that night and drive his horse and buggy off before 10 o'clock;

I cannot swear as to whether he left before 11 o'clock or not, but I do not think he did.'' This witness described the house as fronting east, a gallery in front, and a hall through, he occupying the southeast room and appellant a room on the north back across the hall. Appellant said ''I sleep across the hall just opposite Pete.'' Appellant's wife swore there was just a hall between Pete and appellant's rooms, and that the door from each room opened into this hall. Pete Porter and others testified the sheriff, Smith, with a posse, went to appellant's about 2 o'clock at night after deceased's body had been found to arrest appellant. Upon reaching there Pete swore the sheriff ''yelled 'hello.' '' That he was ''waked up by some one calling 'hello,' 'hello.' ''''I raised up in bed and said 'hello.' '' The sheriff then asked him, ''Can you tell me where Uncle Johnnie Sanderford lives, and I said he was way off the road, and he asked me who was living there and I told him I did, and he said didn't Willie Porter live here.'' He answered that he did and that he was back in his room. Pete Porter then got up out of bed, armed himself with his pistol and he says went to the door. The State then asked him if he did not then ask Mr. Smith, the sheriff, if there was anybody with him who would hurt Willie Porter. He denied that he asked the sheriff any such thing. The sheriff's posse at the time was located at different places about the house so as to prevent an escape and arrest appellant if he had attempted to escape. Afterwards the State introduced the sheriff, Smith, who testified, over appellant's objections, that on said occasion Pete Porter asked him if there was any one with him that would hurt Willie Porter.

On direct examination appellant had not asked his brother Pete anything about what occurred at the time of appellant's arrest that night. From the testimony, there can be no doubt but that appellant heard the sheriff and all that was said at the time between him and his brother, Pete, and heard Pete ask the sheriff if there was any one with him who would hurt him, appellant.

The authorities hold that when such conversations between others occur in the presence or hearing of an accused they are admissible. Holden v. State, 18 Texas Crim. Rep., 91; Oliver v. State, 70 Texas Crim. Rep., 140; Miller v. State, 67 Texas Crim. Rep., 654; La-Grone v. State 61 Texas Crim. Rep., 170; Southall v. State, 77 Texas Crim. Rep., 490; Robbins v. State, 73 Texas Crim. Rep., 367; 200 S. W. Rep., 525; 2 Whart. Ev. (2 Ed.), sec. 1136. Such testimony is not so collateral as that the answer of the witness is conclusive; and he can be impeached by showing he did ask such question as was done in this instance.

The authorities also hold that *animus*, bias and interest, etc., of any witness can always be shown, and that such testimony is never collateral. The testimony makes it clear that as soon as Pete Porter learned the sheriff was there to arrest appellant, he armed himself, went out of his room into the hall right at appellant's room, and

demanded to know of the sheriff if there was any one with him who would hurt appellant. Thus showing his great interest in appellant's behalf. But the appellant requested, and the court gave his special charge as follows: "You are charged that the evidence of Hugh Smith, a witness for the State, in reference to what R. L. Porter might have said to him on the night that the defendant was arrested cannot be taken by you nor considered by you as any evidence whatever of the defendant's guilt or innocence, and the same should not be considered by you for such purpose, but if considered can be considered by you only for the purpose of determining the credibility and the weight to be given to the testimony of R. L. Porter, and for no other purpose."

So that, under no circumstance, does appellant's bill on this subject show reversible error.

The judgment is affirmed.

*Affirmed.*

DAVIDSON, PRESIDING JUDGE. (dissenting).

MORROW, JUDGE. (Concurring).—The admissibility of the testimony of the mother of the deceased, to the effect that some two hours before the deceased left her home she said that she was going to a haystack to meet Willie Porter, and from there was going to Nolanville to take the train to go to San Angelo, and that she supposed Willie Porter would bring a buggy or car, presents a question of difficulty. I have concluded that under the facts of the case it was admissible, under the rule of evidence that a declaration showing a state of mind it is excepted from the rule excluding hearsay. On the subject Mr. Wigmore, in Sec. 102, Vol. 1, in his work on Evidence, declares the rule to be that where the existence of a design or plan of one deceased is relevant to the issues involved in the trial, that the fact that such design or plan existed may be proved by the declaration of such person. In Sec. 1726, Vol. 3, the same author on this subject says: "(1) Where on a charge of murder the defendant seeks to prove that the deceased killed himself or that a third person killed him, this hypothesis is of course properly open to proof. Yet, as a matter of precaution, courts usually require something more than a single piece of evidence, and will not admit, for example, the mere fact that the deceased was melancholy or that a third person fled the country. But, assuming that, the data as to suicide or a third person's guilt are sufficient to be considered, and that the deceased's plan of suicide, or the third person's plan of killing, is one item herein, then the declarations of the deceased or the third person are a proper mode, under the present exception, of proving the plan." Mr. Wharton in his work on Evidence, Vol. 1, p. 495, also cites authorities on the subject. See Clanton v. Howard, 205 Mass. 128, 91 N. E. Rep., 397.

In this case the burden was upon the State to prove beyond a reasonable doubt that the deceased came to her death at the hands of appellant by violence used by him. Relying upon circumstantial evidence, it was necessary to exclude the hypothesis of suicide which was suggested by the evidence. The declaration of the deceased evincing a design to go to the haystack, thence to Nolanville, and thence to San Angelo, was a fact that might have been considered by the jury of some weight in negativing the theory of suicide. It was also a circumstance admissible to explain her presence at the haystack, which was testified to by some of the State's witnesses. See Wigmore on Evidence, Vol. 3, p. 2222; Ex parte Blumer, 27 Texas, 734. The difficulty in deciding the question arises from the fact that the declaration of the deceased mentioned is inseparably connected with the appellant, and tends to lead the mind to the conclusion that deceased's design was influenced by an agreement with the appellant, and to thus indirectly establish by hearsay the conduct of appellant. Under the authorities, however, it seems that the declaration proved was admissible.

In my opinion the impeachment of Pete Porter was improper. It appears that when the sheriff and his posse went to the house where appellant was at night-time, that his brother, Pete Porter, asked the sheriff if there was anybody with him who would hurt Willie Porter. A predicate for the impeachment of Pete Porter was laid. He denied making this statement, and the State afterwards introduced testimony to contradict him. Granting that the remark was made, and that appellant heard it, I think it was not admissible against him. The doctrine that a statement made in the presence of an accused under circumstances which made it his duty to speak is admissible against him, I think cannot be justly invoked in support of the theory that the testimony in question was proper. The inquiry attributed to Pete Porter was not, in my opinion, such a remark as required the appellant to speak. The law on the subject is declared in Holden's case, 18 Texas Crim. App. 91, and other cases cited in the opinion written in this case. The proper application of the rule of law thus recognized, in my opinion, should result in the exclusion of the evidence. I am not satisfied, however, that the error in admitting it is one which authorizes a reversal. It seems to me to have been a remark which might naturally come from the brother of appellant without suggesting knowledge on his part of the homicide in question. A number of men coming to his house in the night-time, first making inquiry as to its being the home of another party, and then asking if appellant was there, would not unnaturally prompt inquiry of a brother of appellant as to the design of those making the inquiry, their conduct being such as to arouse the suspicion that their attitude toward Willie Porter was hostile. Without the knowledge of any crime it seems not unnatural that he should have made the inquiry.

The instruction given by the court not to consider or be influenced by any remark or the discussion of any fact or circumstance by counsel, when such fact or circumstance is not in evidence, does not receive my full endorsement as stating a correct principle of law in a case of circumstantial evidence. In such a case the duty of the State to prove the guilt of the accused as measured by the law of circumstantial evidence is affirmative, and the absence of facts is available to the accused in argument.

This much is said in view of the opinion written by my associate in the case. The charge, however, is not subject to the criticism made in the bill attacking it, nor shown to have affected any argument made and in view of the opinion of the member of the court who has carefully read the record and written the opinion to the effect that the charge was not harmful, I am not disposed to hold it reversible error.

The record is a long one, and has come to my hands near the end of the term, rendering it impracticable for me to give it as careful review as is desired. From such review of it as I have been able to give I found no error which I regard as reversible. I, therefore, concur with my associates in its affirmance.

ON REHEARING.

October 22, 1919.

LATTIMORE, JUDGE.—This case is before us on appellant's motion for rehearing. It is alleged that the original opinion erred in holding correct the action of the lower court in refusing to permit counsel for appellant to be present in the court room when the special venire was drawn. The contention is that former Article 647, C. C. P. was not repealed by what is called the "Jury Wheel Act of 1907" (p. 269 General Laws of 1907) and that said Article requires that a special venire be drawn in open court; and that by the exclusion from the court room of counsel for appellant it is shown that the drawing of said venire was not in open court, in the contemplation of the law.

We cannot agree with appellant. Section 9 of said Act of 1907 specifically amends Article 647, C. C. P., re-writes said article, and the same as amended is now Article 660 Vernon's C. C. P. In Brown v. State, 54 Texas Crim. Rep., 121, 112 S. W. Rep., 80, in a dissenting opinion by Judge Brooks is found the language quoted in appellant's motion, to-wit: "That said law (1907 is constitutional, and does not repeal the old jury law except in counties affected thereby." Neither this nor any other authority cited hold that Article 647 was not amended by said jury wheel act, and we hold that it was. Discussion of said pro-

position however, is foreign to the question as to whether the venire was drawn in open court. Appellant's bill of exceptions shows that said venire was in fact drawn in the courtroom, in the presence of the court, and by the clerk. The only fact relied upon as showing that it was not in open court was that counsel for the appellant, at the request of the court, absented himself from the courtroom. The fact that appellant's counsel was not permitted to be present in no sense shows that the court was not open. Witnesses are constantly excluded from courts while court is in session, and juries in appropriate instances are also, and other illustations might be instanced as showing that the mere exclusion of counsel is wholly insufficient to support any contention that the venire was not drawn in open court. Our statute expressly says that the accused shall have one day's service before the day of the trial, of a copy of the names of those summoned under a special venire *facias*, and we know of no authority holding that the attorney of the defendant in such cases has the right to be present at the drawing of the venire or any right to service of a copy thereof, other than as fixed by statute.

Appellant cites the heavy penalty given him as an illustration of the fact that he was injured by not being permitted to have a copy of the venire sooner, but in our judgment that proves nothing. The record shows that the jury were selected from the regular venire and that appellant did not exhaust his challenges. We think this contention of appellant wholly without merit.

The testimony of witnesses Durrett and Smith that in a field several miles from the place where the body of the deceased was found, and at a point near where it is claimed deceased met appellant on the night of the alleged homicide, and at a time some two weeks subsequent to the disappearance of deceased, said witnesses saw tracks made by a woman's shoe similar to tracks which in their opinion would be made by shoes worn by the deceased when she left home. There was no evidence that said tracks were accompanied by a man's tracks, such as might have been made by appellant. It is unquestioned that the young woman was in that vicinity on that particular night. In our opinion this evidence is impossible of injury to appellant.

The testimony as to letters seen in deceased's possession, addressed to appellant since his marriage, and that similar letters went through the mails on that route, were admissible as circumstances showing the continuation of the illicit relations of the parties subsequent to said marriage, and leading up to the time of the alleged homicide.

Nor do we think there was any error in that part of the charge which told the jury that neither counsel had any right to discuss any fact or circumstance not in evidence, and that the jury should not be influenced by any remark, or the discussion of any fact or

circumstance not in evidence. We are unable to agree with the contention that this is equivalent to depriving appellant of the benefit of arguing and discussing the lack of guilty facts and circumstances in the case.

We think the objection not well taken to the testimony of Sheriff Smith, to the effect that when he went to appellant's home about two o'clock at night to arrest him, Pete Porter, appellant's brother, came to the front of the house, and among other things, asked the sheriff if there was any one with him who would hurt appellant. The proof showed that the said Porter was the most material witness for appellant, lived in the same house with him, and testified fully to an alibi at the instance of appellant. The matter complained of in this contention was relied upon by the State as an impeachment and a proper predicate was laid when Porter was on the stand by asking him if he did not make said statement to the sheriff, which he denied, and thereupon the sheriff was introduced and testified that Porter did make to him said statement. It is clear that if appellant himself had made such statement to the sheriff when he was arrested it would have been admissible as tending to show guilty knowledge and fear of the consequences of the crime, etc. The same general rule applies to material witnesses. The witness Porter, as stated, was not only the brother of appellant, but his most material witness. Mr. Branch says, in Sec. 86 of his work on Criminal Law: "The motives which operate on the mind of a witness when he testifies, are never regarded as immaterial or collateral matters." A party may prove the declaration of a witness which tends to show bias, interest, prejudice, or any other mental state or status which fairly construed might tend to affect his credibility." Mason v. State, 7 Texas Crim. App., 623; Sager v. State, 11 Texas Crim. App., 110; Bonnard v. State, 25 Ter. Crim. App., 173; Green v. State, 54 Tex. Crim. Rep., 3; Geller v. State, 56 Tex. Crim. Rep., 460; Reddick v. State, 47 S. W. Rep., 993."

We are unable to say that the inquiry of the witness Porter testified to by witness Smith did not tend to show his interest, bias, or knowledge of a situation from which danger to his brother might arise, and hold the evidence properly admitted.

We think the statements made by deceased to her mother while she was packing her clothes and dressing, preparatory to leaving home on the night of her disappearance in addition to the reasons given in the original opinion, were *res gestae* of such acts directly explanatory thereof, and admissible in evidence. Upton v. State, 48 Tex. Crim. Rep., 289; Stockman v. State, 24 Tex. Crim. App., 287; Russell, 11 Tex. Crim. App., 288; Dunham v. State, 3 Tex. Crim. App., 465.

We have no doubt of the sufficiency of the evidence to establish the *corpus delicti*.

The facts surrounding the death of the young lady were such as to make it necessarily a suicide or a death resulting from the criminal agency of another. According to the testimony, when last seen alive by witnesses, deceased was in good health and appearance and going away on a trip to San Angelo, for which trip she made her careful preparations, taking with her all of the clothes in a laundry bag, and two small valises. When next seen by witnesses, her dead body was floating in deep water in Leon River, about fifty or sixty yards above the Miller Springs bridge; and around her legs was a bailing wire so tightly wound and twisted as to render voluntary locomotion by her wholly impossible, and in said wire was a tell-tale loop, indicating the use of a weight of some kind. It was claimed, but without any evidence in support thereof, that the body may have fallen from the bridge and afterwards drifted to the place where found. This deduction is conpletely overcome by the further fact that at practically the same point where the body was found, the laundry bag of deceased was found at the bottom of the river, having in it the two little valises, and said laundry bag was also tightly wound with bailing wire, in which wire were also the same tell-tale loops, indicating the use of weights. It seems incredible of belief that the laundry bag could have floated on the bottom of the river from the bridge to the same spot where the body was found. Not only this, but the doctors who examined the body of deceased, said that the face and head were discolored, eyes and tongue protruding in a manner that could result from strangulation, though they could not state from the time the body had been in the water that death actually resulted from strangulation. In addition to these facts an unimpeached witness testified that a few days before the discovery of the body, appellant was seen walking back and forth along the bank of the river opposite the spot where the body was found later.

There is nothing in the record suggesting any motive for the removal of deceased except at her own hands to avoid the disgrace, or at the hands of the appellant for the same reason. The theory of suicide is made impossible by the surrounding facts. The evidence satisfied the jury under a fair presentation of the law that the appellant was the guilty agent in causing the death of the young lady, and we see no reason to disturb their finding.

The motion for rehearing is overruled.

*Overruled.*

DAVIDSON, PRESIDING JUDGE. (Dissenting).—On June 26th, 1918, the judgment herein was affirmed. I entered my dissent at the time. On the motion for rehearing I have reviewed the case with decided degree of interest in its legal aspects. My views entertained at the time for not agreeing to the affirmance have been more than strengthened by a revision

of the record and the rulings of the trial court. I do not believe that the facts, as evidenced by the record, justify the conviction. Under the Texas statute it is necessary as a prerequisite to a conviction in homicide cases that the *corpus delicti* be proved. The body of the deceased must be found and identified. It must also be shown that the deceased came to death as a result of violence. It must further be shown that this violence was caused by the accused, and necessarily, in order to constitute as criminal the violence inflicted, it must be unlawful. The record is very voluminous, and the writer will not undertake to state, except in a general way, either the substance or effect of the testimony.

Appellant and deceased had been friends and sweethearts. He "had been keeping company with her" for eighteen months or more, and their relations were perhaps illicit. In November, prior to the death of the deceased the following March, appellant married another girl. Deceased at the time of her death was pregnant. It it shown that the deceased had been receiving the attention of other men as late as the night of the 10th of March before she left home on the 12th of March, the night of her supposed death. The details are unnecessary to state. On the night of the 12th of March, about 11 o'clock, the deceased left her home in company with her mother and sister, having prepared herself for a trip, stating that she was going to meet the defendant at a straw stack, which was shown to be about seven or eight hundred yards from the residence, and go with him from there to Nolanville, thence by rail to San Angelo. The mother and sister stopped or secreted themselves some thirty or forty yards distance from the haystack. The girl was shortly joined by a party who came in a buggy, whom the mother and sister of deceased indicate was the defendant. On the night after the discovery of the body of the girl in the Leon river, the mother stated she did not know who was the party meeting the deceased at the haystack, and this was in the presence of her daughter who made no statement, but believed it was defendant on account of his size and appearance. She was anticipating, however, that defendant would meet the deceased at the haystack by reason of the statement made by her deceased daughter. On March 21st the body of deceased was found in the Leon river about fifty yards above what was known as Miller Springs Bridge. This bridge spanned the Leon river. The body was removed that night and carried to undertaking parlors in Belton, and was identified as the body of Emma Staley. Before leaving home she dressed herself for the trip, making ample adjustment of her clothes, hair and paraphernalia as would be expected on the occasion of a lady going on a journey. When her body was found her hair, clothing, hat and paraphernalia were not disturbed, and in the same condition as when her mother saw her last before

4—68 T. C. R.

leaving the house and before reaching the haystack. The hair had not been disarranged, nor her clothing about her body. There was a veil on her head. This was not disturbed. She was dressed in a coat suit. There was bailing wire tied some inches below her knees around both legs, twisted together, either in the front or at the left side, and her top skirt was under the wire in front and not under the wire behind. Her grip or hand-satchel and a bag of clothing were found in the river near by, having been sunk with weights attached. Two autopsies were made, one immediately after getting the body to undertaking establishment; the other on the 3rd of April. These examinations showed no violence upon the person of deceased, and no poison found in the stomach, and nothing which would indicate she came to her death by violence. The laundry bag containing her clothes was found some two weeks after her body was discovered, at the bottom of the Leon river at a point, near where the body was found. This laundry bag had two bailing wires twisted around the outside of it. The body was in a bad state of decomposition and discolored, the lips swollen, eyes and tongue slightly protuding. No examination was made of her lungs. The Miller Springs Bridge was about forty feet above the water and the water was some ten or twelve feet deep at that point. There seems to have been a sort of pool, or lake formed there by reason of a dam below. The defendant lived about six miles west of Belton, and deceased about four miles northeast of the same town. The Miller Springs Bridge was on the road leading from deceased's residence to the city of Belton. It was shown that other men kept company with deceased after defendant married in November, 1916, being with her as late as Saturday night, March 10th. Defendant was a small man weighing about 130 pounds, five feet and five inches in height, and about twenty-seven years of age. Deceased was about twenty-three years of age, a single woman and weighed about 120 pounds. So far as the record shows, the deceased was never seen alive after she left the haystack. It is also in evidence that defendant had a conversation with deceased some time in January, 1917, and another on March 10th. This latter conversation occurred in the town of Belton. What was said at these conversations is not shown. No letters were shown to have passed between the parties, but the State introduced testimony that three letters from the neighborhood where deceased resided were placed in the mail, addressed to the defendant. As far as the record shows there had been no complaint by the deceased or any member of her family against the defendant. The defendant's defense was alibi, his testimony showing he was at home, ten miles from where deceased lived, on the night of March 12th. An automobile was seen going in the direction of the haystack at about 8 o'clock on the night of March

12th, and that at 11:45 an automobile and a buggy was seen leaving a pasture which adjoined the straw stack, going in the direction of Miller Springs Bridge, both driving slowly. That about 12 o'clock that night an automobile was seen to drive on Miller Springs Bridge opposite to where the body was found, stop, turn out the lights, remain a few minutes, and then proceed toward Belton. It is not claimed, nor does the evidence show, that defendant or any of his family owned an automobile. The defendant's brother, with whom he lived, owned a buggy. On Saturday night, March 17th, a witness some three hundred yards west of Miller Springs Bridge near the river, heard three screams of a woman as if in great distress, growing fainter each time. This witness passed an automobile at said point with the lights out about 10 o'clock on that night.

No witness testified as to the cause of the death of deceased. The writer is of opinion that the record testimony does not show she came to her death from violence. The poison theory is excluded by the testimony. The body was swollen and discolored. Some parts of it more discolored than the remaining portions of the body. The entire body, to a certain extent, was discolored. Three doctors examined the body and all testified there was no evidence of bruises or external violence of any character upon any part of the body; that there was no evidence of poison, although Dr. Robinson made an exhaustive analysis of the stomach and its contents. Dr. McIlhannon testified that from the examination of the body which he made he could not determine what was the cause of the young lady's death. Dr. Crain testified: "I could not tell if death had been produced by choking or strangulation; if you had seen the case within a few hours after the death, you could have told, but I don't think I could tell in the condition this body was in when I saw it." Dr. Robinson did not testify as to the cause of deceased's death. He testified to the condition in which he found the body some two weeks after it was found, that there were no unusual evidences about the condition of the body, unless there was possibly some small blood vessels at the base of the brain which were gorged, more than usual; but he could not say that the smaller vessels were gorged, stating: "I couldn't be positive about that because that could be postmortem changes." Dr. Crain also testified that the condition of the body in which it was found at the time he made examination could have been caused by decomposition and post-mortem changes. Dr. Robinson further stated: "I found no evidence of any blow or external violence on the skull, the brain or the scalp, and I found no poison in the stomach of any kind or character." He also testified that a choke could cause the condition in which he found the body; that a jump of thirty feet from the bridge into the water with head

down would tend to cause the same condition, or that if immediately after death the head of the body was lower than the balance of the body, it would cause the same conditions. Dr. Crain testified also: ''I could not determine from the condition of the body as to whether or not there had been any attempt to penetrate the vagina with any instrument of any kind. I could not determine that because there was so much swelling and sloughing of the mucuous membrane of the vagina that I could not say positively whether there was any tampering with the vagina or not. There was some blood on her underclothing, but whether this was bloody serum or water, I don't know. There would have to be blood to make bloody discoloration and that possibly might have been the result of decomposition. The bag of water had not been ruptured around the child and I removed the entire womb with the child in it. She was between five and six months pregnant.'' Her underclothing, her veil, her hair, the pins in her hair, the lace on her collar and all ·of her clothes were in an undisturbed condition. The undertakers and doctors who examined the body could not tell ''for sure'' how long the body had been in the water or dead, but probably seven to ten days. The bailing wire wrapped around her legs, as already indicated, could have been done as well by her self as by a third party. The wire was a little lower down toward the ankle on one leg than the other, and, as before stated, some of the witnesses say it was twisted in the front, and one witness testified to the effect that it was twisted on the left side. This could have been done as well by herself as by another.

In support of the insufficiency of the evidence, as viewed by the writer, he cites Lovelady v. State, 14 Texas Crim. App., 545; Robinson v. State, 16 Texas Crim. App., 347; Harris v. State, 30 Texas Crim. App., 549; Conde v. State, 35 Texas Crim. Rep., 98; Follis v. State, 51 Texas Crim. Rep., 186; Hunter v. State, 31 S. W. Rep., 674.

It will be noticed that this case is one of circumstantial evidence. Under this theory of the law every reasonable hypothesis must be overcome except that the deceased came to her death at the hands of the defendant. The writer is of opinion that this rule of law is not met. It is a very doubtful issue, under the testimony, as to whether the defendant was at the haystack that night or not, his evidence being of a positive nature on his alibi theory, that he was so placed in connection with the matter that he was not at the haystack or straw stack that night. The State's theory was, by the mother and sister of deceased, that he was present and left there in company with the deceased. There is also testimony that there was an automobile and buggy driven from near the haystack going in the direction of the place where the body of deceased was found. Another proposition growing out

of this phase of the law is, that it must be shown to the exclusion of every reasonable hypothesis except that of guilt that defendant killed the girl, that is, that she came to her death by violence at his hands. There were no wounds found on the body, no fracture of the skull, no wounds of knife, pistol or gun shots, and in fact the testimony excluded, as far as human testimony could under the circumstances, the idea that she came to her death by any outside violence. She could as well have committed suicide. She may have jumped from the bridge or she may not. She may, if it was defendant with her, on account of the condition and relation of things, had a contract with him that both were to commit suicide, and she went in the river first, and he failed to carry out his part of it. But whatever may have been the conditions at the time, they are not shown except as above stated. There was evidently no struggle; could not have been any choking; there was no lick upon the head, and there was nothing to indicate any struggle of any kind, because her hair, hat, hair pins and clothing were undisturbed, and it was found she did not die from strangulation or choking. The relative strength of the parties, the man only weighing 130 pounds and the girl 120, had he undertaken to strangle her or throw her in the river, or kill her by violent methods, would leave evidence of that fact. Her clothing would have been disturbed, her hair would have been disarranged and there would have been quite a number of circumstances that would unavoidably have occurred had there been a struggle from the choking, or strangulation theory. It would be more than difficult even to imagine how the wire could be placed around her legs forcibly without disturbing her clothing. The writer does not care to pursue this phase of the case any further. Unless the State can show by some means that this girl came to her death by violence of some sort at the hands of a third party, the *corpus delicti* has not been shown. This may have been a homicide, or it may have been a suicide, but this testimony does not show, and leaves it in more than serious doubt. The rule of law with reference to circumstantial evidence has not been met, and a non-compliance with the rules of that phase of the law would debar a verdict of the jury of guilty, or an affirmance of this judgment as the record presents it.

There are some very interesting questions presented by bills of exception. Some of these, the writer is of opinion, form the basis of a reversal.

There are two bills of exception reserved to the ruling of the court permitting the witnesses Durrett and Smith to testify as to tracks. The bills are full and complete, and substantially show that the witness Durrett, some days after the finding of the body in the river, visited the neighborhood of the strawstack where it is supposed the defendant and the girl met on the night of the 12th

of March. Some days after this he and the witness Smith, sheriff of Bell county, visited this place together. The bills show that they had a map of that immediate section and surveys of land; that somewhere in a southerly direction from the haystack, three or four hundred yards perhaps, which was in the direction of the Miller Springs Bridge, they found a *track* which they *supposed* to be that made by a woman. They were permitted to testify, over the objection of defendant, to so finding, it being something like two weeks or more after the track, if made by the deceased, is supposed to have been made, and there had been a rain in the meantime, and it was an isolated track. There was no evidence that deceased made the track. Their evidence confines itself to their opinion that it was a woman's track. It will be noted that the State's case was that she did not walk but rode in a buggy from the strawstack. All objections were overruled, and *a shoe supposed* to be one of the shoes worn by the deceased girl was handed the witnesses, and they testified they *believed the track could have been made by such a shoe.* The objections were numerous, and it is not here the purpose to deal with them in detail. I am of opinion this testimony was inadmissible. It was brought out by the State on its examination in chief, and not in contradiction of any fact offered by the defendant. This court in Mosely v. State, 67 S. W. Rep., 103, said:

"In this case there is no suggestion of any measurements or comparison of the tracks found near the place of the homicide with those of the accused. The witness had seen tracks near the place of the homicide and then saw the foot of the accused at trial and by this merely he was permitted to state his opinion as to the identity of the tracks. We do not believe this should have been permitted."

In the case of Smith v. State, 77 S. W. Rep., 453, this language was used: "The objection here charged is that the witness is not sufficiently definite as to the character of the tracks to authorize him to give an opinion as to the similarity thereof, but stated in substance that the tracks he saw on the ground were of a number eight or nine shoe; that the impression of the heel of the right foot as it appeared on the ground was that it was made by a shoe worn off on one side of the heel and that the shoes which he saw worn by appellant on that morning appeared to be a number eight or number nine and that the heel on his right shoe was worn off on one side. That the shoes also appeared to be broad across the ball, tapering towards the toe. That he did not take the measurements of the impression on the ground nor of the shoes. In this connection it may be observed that other witnesses examined the locality and state that the ground was very hard there and no tracks apparent. That a short time after the body was discovered a great number of people were there and if there had been tracks

they would have been obliterated. Therefore looking at the witness' testimony alone we do not believe that the facts detailed by him were sufficiently definite to authorize him to give his opinion as to the similarity of the impressions on the ground with those of the shoes worn by the defendant. He was not even certain as to the number of shoe worn by the appellant, said it was an eight or nine, and the only peculiarity suggested by him is as to the heel of the shoe and the impression of the heel on the ground. It occurs to us that before a witness is authorized to give an opinion upon so vital a question as the similarity of tracks as a circumstance tending to connect appellant with the offense charged his testimony should be more certain than is manifested here.''

In Tankersly v. State, 51 Texas Crim. Rep., 224, 101 S. W. Rep., 234, the court said:

''Before a witness can testify or give his opinion as to similarity of tracks found upon the ground and tracks made by appellant there must be some measurement taken of the tracks or some fitting into the tracks found upon the ground of the shoes of appellant, or there must be some peculiarity in the tracks found upon the ground corresponding to shoes known to belong to appellant or to tracks known or admitted to have been made by him.''

In these cases the question turns upon admission of tracks supposed to have been made by the accused, wherein in the instant case it was tracks supposed to have been made by deceased. That would make no difference in the application of the principle. This was an important question. This would indicate, if this was the track made by the girl, that she was walking and going in the direction of where her body was later found. She rode in a buggy if the State's contention is true. While it might be argued that there were no other tracks there except the one supposed to have been made by the girl, and the defendant was not with her, this would not change the error in the admission of the testimony as it affected defendant. In this connection we might also cite Ballinger v. State, 144 S. W. Rep., 91. These witnesses certainly were not qualified to testify in regard to this matter. They gave the jury no criterion by testifying to the conclusion that this was a woman's track, or might be a woman's track, and especially that it was a track by deceased and that the shoe exhibited to them might fit it. Under no case and no rule of evidence that has been called to the attention of the writer could this testimony be used against the accused.

Appellant also reserved exception to the testimony of Julia Miller and Frank Tulloch in regard to letters. I am of opinion these letters, and the testimony with reference to them were not admissible. They did not undertake to testify that the girl wrote the letters, or that he received them. Quoting from the testimony of Julia Miller: ''Since Willie Porter married I have seen a letter

in the possession of Miss Emma Staley addressed to Willie Porter, Route 7, Belton, Texas, and stamped and mailed by her at Belton. That was about two months after his marriage. I don't remember whether or not his postoffice address is Belton, Route 7. I do not know anything about it. I happened to see the letter because I came over to town with her and she had it with her. We came to town on that occasion in her buggy and I saw the letter on the way to town and not before we left her home. I do not know whose handwriting it was addressed in. I am familiar with Miss Emma Staley's handwriting."

The witness Tulloch testified as follows: "It seems that prior to March 21st, there was a letter went through addressed to Will Porter, Route 7, Belton, Texas, but I do not say what box it came from nor I cannot say about when I took up that letter, but it was prior to the death of Miss Staley or before she was found in the river and within six months of that time. In taking up the mail we have our pouch before us and we take the letter from the box and we examine it to see if it is properly addressed to the town and State and stamped and we handle it in the pouch until it is returned to the office. We count the mail now, but they do not count them every month. The letter addressed to Willie Porter was left at the postoffice."

It seems that Frank Tulloch was a mail route agent or carrier. There are various and sundry objections urged to all this testimony. These will not be taken up *seriatim*. This testimony, in my judgment, was not admissible. In the case of Taylor v. State, 47 Texas Crim. Rep., 101, we find this language: "Letters not shown to have been written, introduced or received by defendant in response to those written by himself or under his authority are not admissible." This matter was not *res gestae*, but was hearsay, and not admissible under any known rule of law that has been called to my attention. Nowhere in the record is it shown that defendant had any knowledge of said letters, or that he ever received them. What evidence there is with reference to the reception of a letter from her by defendant is a positive denial. In the Hollingsworth case, 78 Texas Crim. Rep., 489, the question when letters may or may not be admitted, even where they are received or shown to have been received, was discussed fully by Judge Harper in an opinion on rehearing, in which the writer concurred, and Judge Prendergast dissented. The same question came in the second appeal of the Hollingsworth case, 80 Texas Crim. Rep., 299. It is also referred to in Hollingsworth case, 199 S. W. Rep., 626. Under these authorities the statements of these witnesses with reference to these letters were inadmissible. It was not shown even that deceased wrote the letters. The letters that Tulloch testified to were not even identified in any way as being the letters to which Julia

Miller testified, and it is nowhere shown that appellant received these letters, and when called to his attention on the witness stand, it is shown by his testimony that he did not receive the letters and had no communication with deceased by mail, and no correspondence.

There is another important question which, it occurs to the writer, is clearly reversible. Pete Porter, brother of defendant, was used as a witness by the defendant to prove an alibi. To this the witness testified as did other witnesses. The alibi related to the disappearance of the girl, to-wit: the 12th of March. The body of the girl was found on the 21st of March. On the night of the 21st, or rather the morning of the 22nd, about 2 or 3 o'clock in the morning, the sheriff rode up to the residence of Pete Porter where defendant was living, and asked Pete Porter if that was where Mr. Sandford lived. He told him he was on the wrong road, and he then asked if Willie Porter was there, and was informed that he was. The sheriff then was permitted further to testify that Pete Porter asked him, "Is there anybody out there that will hurt Will Porter?" This was brought out by the State on cross-examination of Pete Porter. Pete Porter denied the statements. Mr. Smith, the sheriff, was then placed upon the stand and permitted, over objections of appellant, to testify that the conversation did occur as indicated. Objection was urged for various and sundry reasons. I am of opinion these objections should have been sustained. When this matter was brought out by the State it made the witness a State's witness. It was in regard to matters about which the defendant had not questioned the witness; it was new matter, and when the witness Porter denied making the statements, the matter should have ended. It was but a failure of testimony. The witness had testified nothing against the State, and to no fact that could possibly be injurious to the State; he being the State's witness, the matter should have ended, and the testimony not permitted. This was a collateral matter to the main issue, and, therefore, his answer could not be subsequently contradicted by the State. Rainey v. State, 20 Texas Crim. App., 473; Drake v. State, 29 Texas Crim. App., 265; McCray v. State, 44 S. W. Rep., 170; Hall v. State, 66 S. W. Rep., 783; Brittain v. State, 85 S. W. Rep., 278; Holland v. State, 60 Texas Crim. Rep., 117, 131 S. W. Rep., 563.

Again, there are quite a number of decisions of this court to the effect that failure to make proof in an attempt to impeach its own witness, is no ground for impeaching the witness. Bennett v. State, 24 Texas Crim. App., 73; Dunnagain v. State, 38 Texas Crim. Rep., 614; Smith v. State, 45 Texas Crim. Rep., 520; Scott v. State, 52 Texas Crim. Rep., 164; Wells v. State, 43 Texas Crim. Rep., 451; Owens v. State, 46 Texas Crim. Rep., 14; Hanna v.

State, 46 Texas Crim. Rep., 5; Ware v. State, 49 Texas Crim. Rep., 413; Skeen v. State, 51 Texas Crim. Rep., 39; Quinn v. State, 51 Texas Crim. Rep., 155; Shackelford v. State, 27 S. W. Rep., 8; Finley v. State, 47 S. W. Rep., 1015; Knight v. State, 65 S. W. Rep., 88; Gibson v. State, 29 S. W. Rep., 471; Kessinger v. State, 71 S. W. Rep., 597; Erwin v. State, 32 Texas Crim. Rep., 519; Williford v. State, 36 Texas Crim. Rep., 414, 37 S. W. Rep., 761; Ozark v. State, 51 Texas Crim. Rep., 106, 100 S. W. Rep., 927; Johnson v. State, 36 Texas Crim. Rep., 394, 37 S. W. Rep., 424; Largin v. State, 37 Texas Crim. Rep., 574, 40 S. W. Rep., 280; Thomas v. State, 14 Texas Crim. App., 70; Goss v. State, 57 Texas Crim. Rep., 557, 124 S. W. Rep., 107. I think this is a sufficient number of cases to support the proposition above asserted without further collation. That the defendant's witness by cross-examination as to new matter becomes a State's witness in regard to that matter, is supported by a great number of authorities, and if the State fails to elicit the desired answer, it is but a mere failure to make proof, and it is error to permit the State to impeach the witness as to such new matter by proving same, by other witnesses and in this manner get hearsay testimony before the jury. Vaden v. State, 25 S. W. Rep., 777; Woodward v. State, 42 Texas Crim. Rep., 188, 58 S. W. Rep., 135; Owens v. State, 35 Texas Crim. Rep., 345, 33 S. W. Rep., 875; Paris v. State, 35 Texas Crim. Rep., 82, 31 S. W. Rep., 855; Casey v. State, 49 Texas Crim. Rep., 174, 90 S. W. Rep., 1018; Johnson v. State, 22 Texas Crim. App., 206, 2 S. W. Rep., 609; Gaines v. State, 53 S. W. Rep., 623; Maroney v. State, 95 S. W. Rep., 108; Hart v. State, 15 Texas Crim. App., 202; Shackelford v. State, 27 S. W. Rep., 8; Drake v. State, 29 Texas Crim. App., 265, 15 S. W. Rep., 725; Washington v. State, 17 Texas Crim. App., 197.

There is another proposition amply supported by numerous authorities to the effect that it is error to permit the State to impeach a witness by proof, either by admission of the witness, or evidence which lays the predicate that the witness by words or acts, or both, had expressed an opinion of defendant's guilt. Cogdell v. State, 43 Texas Crim. Rep., 178, 63 S. W. Rep., 645; Morton v. State, 43 Texas Crim. Rep., 533, 67 S. W. Rep., 115; Vann v. State, 45 Texas Crim. Rep., 434. The writer deems it unnecessary to cite further authorities. The writer is of opinion this testimony was injurious to the defendant, and that the charge of the court limiting this evidence could not cure the error. It is well settled by an unbroken line of authorities in Texas that where illegal testimony is admitted, the effect of it can not be cured by the court's charge limiting its effect. It is illegal and erroneous, the effect of it cannot be so directed by the charge of the court as to make it legal. This testimony could have been admitted but for one of

two purposes, either to discredit the witness and affect his credibil-ity, or as a fact that this witness believed that his brother was guilty of something that was violative of the law, and in this con-nection the jury would infer, and doubtless did, that Pete Porter was afraid that some of the party was after Willie Porter in connection with this particular matter. It would also tend to in-duce the jury to believe that the witness Pete Porter had testified falsely about his testimony generally, and especially with reference to appellant's alibi on the night of March 12th. It would also tend to lead the jury to believe that the witness knew something about the murder of the deceased, and the inference would be that he received this information from the defendant, as there was no testimony showing that Pete Porter was in any way connected with the girl. This matter could not have been used by the State as original testimony, that is, the statement of the sheriff that Peter Porter made the imputed statements to him. It would not be contended for a moment that this would be original evidence, and if not, under a well settled rule the impeachment of the witness would not be admissible. The matter would be of a collateral nature. This was decided in Drake's case, 29 Texas Crim. App., 265.

There is another bill reserved to the admission of the testimony of Dr. Crain. The State was undertaking to prove as best it could that the girl came to her death by violence at the hands of some-body, and asked Dr. Crain with reference to the congestion of the brain of deceased. Dr. Crain knew nothing about it, and made a statement to the effect that he had heard that Dr. Robinson had said that there was a congestion of the brain, and if that was true, the girl could have come to her death or maybe did by strangulation or choking. Serious objection was urged to this, Dr. Robinson had not so stated, and Dr. Crain himself said Dr. Robinson had not so stated to him; that he had only heard so, and if what he had heard was true, it might be evidence of the fact that she was choked or strangled. The testimony went to the jury. Later Dr. Robinson was placed upon the stand and denied making such statement, whereupon, on motion of the defendant, the testimony was withdrawn, but it had remained for some time before the jury before this occurred. The court withdrew the testimony after Dr. Robinson made his statement, but in my judg-ment this did not sufficiently cure this error to render it harmless. A great number of cases are cited in the original opinion to support the ruling of the court, but upon examination the writer does not coincide with that statement on the applicability of the cited cases. For instance, the Miller case, 31 Texas Crim. Rep., 609 is cited. The writer wrote the opinion in the Miller case. In that particular case there was some testimony adduced bearing upon a collateral matter which did not tend to connect defendant with

the homicide. It was of a collateral nature, and its introduction did not prove or tend to prove the guilt of the defendant in killing the deceased. In the instant case the testimony of Dr. Crain was directly upon the main issue in the case, that the death of the girl occurred by violence at the hands of some one by choking or strangulation. So it was held in the Miller case, it being upon a collateral matter, it was not of sufficient importance to require a reversal, and that opinion recites in that connection that: "It is not intended here to hold that cases may not arise in which the withdrawal of testimony would not cure the error committed in admitting the same; for it may occur that such evidence was of such a prejudicial character as to so influence the jury against the defendant that he would be deprived of a fair and impartial trial." The admission of this testimony comes within that holding. The statement of Dr. Crain, if based upon facts, would tend strongly to prove the *corpus delicti*, that is, that the girl came to her death by violence, by choking or strangulation as the doctor stated. It was introduced for that purpose, and was, therefore, upon one of the most crucial points in the case. The writer does not care to follow this further. This testimony is conceded to have been erroneously admitted by the trial court and withdrawn. The writer is of opinion that the withdrawal of this testimony did not cure the error. This is intensified in another way and brought to the court's attention below. This withdrawn testimony was used in argument of counsel for the State over appellants objection. This also was error.

A bill of exceptions was reserved to the ruling of the court permitting the State to prove through the mother and sister of the deceased statements made by deceased on the night she left home. The substance of it is that she, while dressing herself that night and making arrangements to leave home, said she was going to the haystack to meet the defendant to go with him from there to Nolanville, and thence to San Angelo. In this connection the mother and sister both testified that she prepared herself, arranged her hair and clothing and laundry bag which she filled with clothing, and they accompanied her near the haystack and secreted themselves to watch results, and that defendant came in a buggy and hitched it near by and met the deceased, and after talking with her a while they left, and that is the last they saw of her until after the body was taken from the Leon river on the 21st of March. All these conversations and matters occurred on the 12th of March. If these statements had been closed at the point where the women say they went with her to the haystack and saw the defendant come, there might not have been error. However, that phase of it is not the writer's purpose now to discuss, but to admit the statement that she and defendant were going to Nolanville, and thence to San Angelo, in the mind of the writer, was clearly erroneous. That a party may state his purpose in going

to some place, or doing something, taking some action when it affects him and his purpose, is not the question here at issue. It is where a party makes a statement that affects the party about whom the statement is made in a criminal way, and in such manner as to connect him with some criminal transaction that renders it inadmissible and it may be also stated, as the writer understands the rule, that statements of the character here imputed to the deceased girl were directly and flatly contradictory of the defendant's defensive matters, to-wit: an alibi. He denied himself, in person testifying in his own behalf, that he went to the haystack or saw the girl that night, or had any agreement to meet her at the haystack, and did not meet her. He proved by other witnesses and other testimony that he was not there, and did not leave home that night, and it is conceded that his home was about ten miles from where the girl lived and where this meeting occurred at the haystack. The writer understands the rule, as before stated, to be that statements of this character cannot be introduced, when made in the absence of the defendant and not called to his attention, and about which he is ignorant, as criminative facts against him, and where they contradict his defensive theory. I understand that to be the rule under the decisions of this State, and under many of the decisions cited and relied upon in the original opinion. To take the Bazano opinion, 60 Texas Crim. Rep., 507, written by Judge Ramsey, as an example of the proposition that I have announced; that was a homicide case. That opinion recites: ''The first is that the court erred in permitting the witness, Mrs. Albert Dunlap, over the objection of defendant, to testify as to movements and actions of the deceased, Denny Harris, on the day of the homicide and prior thereto, because said actions and movements were not in the presence of appellant and there was no testimony showing that he had any knowledge of said actions and movements of Denny Harris, and appellant could not be charged with the knowledge of such movements and the causes thereof. This witness testified in substance that deceased left her house about 11:30 o'clock the morning he was killed; that he came by where she was stopping with her daughter; that he had a lead horse; that he stated he was going out to George Foreman's to take the horse there, and that he was going to the next house to get a saddle. This, it appears from the statement of facts, was objected to for the reason that appellant was not present and the movements of Harris on that day cannot be charged to him and is no evidence against him. The testimony was explanatory of the presence of the deceased at the place where he was killed, which was quite a distance from the place where his mother saw him, and was a mere matter of inducement. The cases in which the actions, declarations and intentions of a decedent are held not to be admissible against a defendant who has no notice of them, has always been limited to cases where the issue of self-defense arose in the case, and where such

acts and movements of the deceased could be held to be hostile in their character, and where such defendant had a right to act upon an apparent hostile movement towards him which might, if the rule permitted it, be shown to be in fact innocent." The judge then says: "It can have, we think, no application to such a case as this, and the objection is wholly untenable." The writer finds no objection to that opinion under the facts stated. They were proving the acts and movements of the deceased before the homicide. It did not impugn any defensive matter set up by the defendant. As the writer recalls that case, it was one of insanity and not self-defense. That case lays down the rule, it applies here as the writer understands it, that if the statement made impugned the defensive matter of the accused, it would be inadmissible. The facts of the two cases are not alike, but the writer will readily agree to the proposition that where statements of the deceased could in no way apply to the defendant directly, or impugn his defense, or incriminate him, whether it would be admissible or not, might not be of a reversible nature. As before stated it is not the purpose of the writer here to go into a statement of those matters that did not tend to connect defendant criminally with this transaction. They might have proved that she stated she was going to the haystack, supplemented by proof that the mother and daughter went in that neighborhood, but that is not the matter here discussed. The question here is, that she stated facts that put her with the defendant in a criminal way, and may be used as very strong criminating fact against him and against his defense of alibi. It is a matter about which he had no knowledge under his theory. It was not made in his presence or hearing, nor was it ever brought to his attention. There may be possible cases, however, with which the views here expressed might not accord, but the great weight of authority, as I understand the rule, especially in Texas, would exclude the statement of the girl that she was going to meet and go with defendant to Nolanville, and thence to San Angelo. I do not care further to discuss that question. To the mind of the writer such statement was inadmissible, and upon a vital question in the case.

As I view it, the motion for rehearing ought to be granted, the affirmance set aside, and the appellant accorded a new trial in accordance with what the writer believes to be the law. The judgment ought to be reversed and the cause remanded.